Paul C. MURRAY, Appellant,

v.

Theodore M. GARDNER, Special Agent,
Federal Bureau of Investigation, et al.

No. 83–1750.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 26, 1984.

Decided Aug. 14, 1984.

Gilbert Kenneth Davis, Herndon, Va.,
with whom Kevin P. Donovan, Falls
Church, Va., was on the brief, for appellant.

John D. Bates, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGeno-

va, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before GINSBURG, Circuit Judge, Mac-KINNON, Senior Circuit Judge, and PARKER,* District Judge for the District of Columbia.

MacKINNON, Senior Circuit Judge:

This case presents questions concerning the First Amendment rights of public employees. Similar questions have recently been resolved by the Supreme Court. The facts of this case are clearly covered by these Supreme Court precedents and thus we affirm the District Court's dismissal of appellant's claims.

I.

Appellant Paul Murray, plaintiff below, is a special agent in the Federal Bureau of Investigation. Murray sued six of his fellow agents who were his superiors in the Bureau's Washington Field Office ("Field Office") for alleged violations of his First and Fifth Amendment rights, and for defamation, intentional infliction of mental distress, and conspiracy. He also sought injunctive relief.

In November of 1981, the FBI was forced to develop a plan to furlough approximately one-third of the agents in the Field Office due to funding delays:

The [Field Office] management had decided to meet this one-third furlough requirement by creating a lottery pool. Individuals who were in the pool would be furloughed if the individuals' name[s] were drawn out of a hat which contained the names of all people in the lottery pool. Management personnel and their secretaries were not a part of the pool. No considerations of seniority, veteran status, or performance appraisals were used in determining who would be a part

of the pool. The [Field Office] was the only FBI office to use this furlough method. [Murray's supervisor] informed Murray that his name had been pulled out of the hat and that he was to be placed on furlough.

Joint Appendix at 6 (hereinafter "J.A.").

At the time of the announcement of the plan, Murray was involved in a custody battle for his children, and he believed that even a temporary lay-off would damage his case for custody. Murray contacted the Principal Legal Advisor of the Field Office, Defendant Barry Laken, to explain his objections to the plan. The following day Murray attempted to carry these objections up the ladder by talking to the Special Agent in Charge ("SAC") of the Field Office, Defendant Theodore Gardner, and Gardner's assistant, Defendant John Schreiber. Both Gardner and Schreiber put Murray off, stating "that he would have his opportunity to speak at an 'all employees conference' which was to be held on November 25, 1981." *Id.* at 7.

The events critical to Murray's First Amendment claim occurred following the aborted attempt to meet with Gardner and Schreiber:

15. Later that day the Plaintiff was approached by the Defendant Laken. Laken explained to Murray how a furlough system could result in the furloughing of an individual with a lengthy service record while a person with lesser time on the job might retain his position. These and other statements of the Defendant Laken were intended to give an impression that opposition to the furlough plan could be detrimental to a person's career status.

16. On November 25, 1981, at the all employees conference, Defendant Gardner explained the furlough lottery and opened the floor to questions and comments. When the Plaintiff Murray took the floor to give his observations, he stated that the furlough lottery was arbitrary and capricious, and that consideration of factors such as veteran status

---

* Sitting by designation pursuant to Title 28 U.S.C. § 292(a).

and length of time on the job would have provided a more reasonable standard. He stated that the Bureau had "dropped the ball" by failing to plan ahead and have a furlough plan. He also stated that he found it appalling that the best method the FBI could develop regarding furlough was to throw the careers and lives of their employees, and their employees' families into a hat. Murray also stated that he objected to efforts that were made to keep him silent in regards to his views. The Defendant Gardner asked Murray how he felt he had been coerced into silence. Murray responded by stating that he had been approached by Principal Legal Advisor Laken who informed him how an individual with Murray's tenure could be replaced based on sub-standard job performance. Gardner then ordered Murray to report to the Defendant ASAC Schreiber's office after the conference.

*Id.* at 8–9. Murray's charge of coercion, on its face a very serious accusation, set in motion a chain of events which would eventually lead to disciplinary action against Murray. The complaint alleges that SAC Gardner demanded that Murray make formal charges against Laken. *Id.* at 9. "Gardner stated that he ... needed a memo to start an official investigation into charges that Laken coerced Murray. Murray and Gardner agreed that the memo could be submitted by close of business of November 30, 1981." *Id.* Murray turned in a "rough draft" on November 30. The draft was wholly unsatisfactory to his supervisors. Though Murray's complaint lacks specificity at this point, it appears that Murray failed to adequately state his allegations concerning coercion and, in his supervisors' view, explain his charges that the furlough system was arbitrary and capricious. Nor did Murray even include his name in the memo. *Id.* Defendant Schreiber wrote to Murray detailing the dissatisfaction with the memo, stating that Murray's conduct was "unacceptable, unprofessional and bordering on insubordination." *Id.* at 9–10. "Schreiber verbally advised Murray that he was the subject of

an administrative inquiry." *Id.* at 10. The confrontation grew worse:

22. In compliance with the Schreiber letter of 12/1/81, Paul Murray wrote a detailed letter concerning the allegations of coercion and the arbitrary and capricious nature of the proposed furlough. Murray retrieved his "unacceptable" rough draft from Schreiber. He was not asked to return the rough draft which he had recovered to aid him in reworking his memorandum, but that evening after he had turned in his final memorandum, Schreiber accused him of insubordination for not returning the rough draft.

*Id.* at 10. Two days later Murray was "confined to perform work in the office rather than his normal duties." *Id.*

[Murray's supervisor] also told Murray that Vatter [another assistant to Gardner] was referring Murray for discipline to the Office of Professional Responsibility within the Bureau because Murray would not cooperate. On December 11, 1981, Murray was interviewed by Ivan Ford, an FBI agnet [sic] assigned to the Office of Professional Responsibility, who informed him only that they had heard there were some problems at [the Field Office] over the lottery. Murray was asked to tell the agents all about the events surrounding the all employees conference. He was not told by the special agent that he was being investigated, although as the interview progressed, it became apparent that Murray was a target.

*Id.* at 11. Defendant Oliver Revell, Assistant Director of the FBI, wrote Murray on January 20, 1982, informing him that consideration was being given to a number of disciplinary actions which might be taken against Murray. The same letter also notified Murray of a number of procedural protections due him given the kind of discipline contemplated:

(1) review of the entire matter by an executive assistant director of the FBI; (2) the right to respond to all charges; (3) use of an attorney in all future proceedings; (4) a written decision from an exec-

utive assistant director of the FBI shortly after thirty days from the date of the January 20 letter; (5) a copy of all supporting documents used by the Bureau in pursuit of the action; (6) appeal to the Merit Systems Protection Board if the proposed [30 day] suspension should go into effect.

*Id.* at 12. Murray responded to this letter on January 28, 1982. No action was taken against Murray until March 11, 1982:

37. On March 11, 1982, Paul Murray received a letter of that date from Oliver Revell. At no time between the date of the initial Revell letter and this one had Murray's retained attorney been contacted by the FBI regarding the charges, and all efforts by Murray to involve his attorney in such meetings with his supervisors had been rebuffed by the supervisors.

38. In the March 11, 1982 letter, Revell notified Murray that he was suspended without pay for fourteen (14) days and that he was on probation for six months. In that letter Murray was told, although this was never mentioned to him previously as part of the investigation, that the situation was caused by personal problems that Murray was having with his son. The letter continued: "these problems were accentuated by your fear, however misguided, of being furloughed and how this would affect your current attempt to gain custody of your son." ...

39. In the March 11, 1982 letter Revell also states that Murray's counter-allegations in his January 28 letter were reviewed in depth and proven to be without substance, yet Revell offered not one shred of evidence that demonstrates that the counter-allegations are without substance....

40. The March 11 Revell letter continues by saying that it is the FBI's duty to protect long term employees from episodic abhorrent conduct caused by an employee's personal problems. Revell then wrote that Murray was suspended without pay for fourteen days and placed on probation for six months. He also stated that Murray's personnel matter would be referred to a personnel officer who would decide whether Murray should be transferred.

41. The March 11, 1982 letter deprived Paul Murray of his right to an appeal before the Merit Systems Protection Board, since under Federal Bureau [of] Investigation regulations a suspension for fourteen days or less was not an adverse decision. Further, efforts by Paul Murray to obtain an appeal by the Office of the Director of the FBI were denied.

*Id.* at 15–16. This statement of the facts is wholly drawn from Murray's complaint. As the District Court granted defendants' motion for summary judgment, we must view the facts in the light most favorable to Murray. *See National Souvenir Center, Inc. v. Historic Figures, Inc.,* 728 F.2d 503, 512 (D.C.Cir.1984).[1]

## II.

### A. *The First Amendment Complaint.*

Murray argued in the District Court that "[t]he actions by all of the Defendants to this suit were part of an effort to deprive the Plaintiff of his Constitutional Right to Freedom of Speech under the First Amendment; both to penalize him for previous lawful expression, and to deter him from making future lawful expression." *Id.* at 18. The focus of this portion of Murray's suit is his speech to the assembled personnel of the Field Office on November 25, 1981. Murray argues that these remarks constituted protected speech. He asserts that since his comments were directed to the furlough plan, they were "clearly a matter of public concern" because the furlough plan involved the disposition of public funds and the quality of the federal

---

1. Murray has moved the court to either strike the twenty-one page appendix of record materials filed as a supplement to appellees' brief or to strike the entirety of the Brief and Appendix for Appellees. We deny the motion. The costs of reproducing these 21 pages, however, shall not be assessed against Murray. Fed.R.App.P. 39.

work force. He further argues that the alleged attempt to coerce him to silence on the matter is itself a matter of public concern.

All parties agree that the Supreme Court's recent ruling in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), is central to the disposition of this case. In *Connick* an assistant district attorney had been fired after she objected to her transfer and followed up her objections by circulating a questionnaire that telegraphed her dissatisfaction with the office management. When she was fired she cited the questionnaire as an alleged exercise of her First Amendment rights which, she stated, were being interfered with. The Court rejected her claim, writing:

> [I]f Myer's [sic] questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge. When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable.... We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

103 S.Ct. at 1689–1690 (footnote omitted). The Court recognized that the crucial determination in cases such as this one would be "[w]hether an employee's speech addresses a matter of public concern," an inquiry to be "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* Thus every case depends upon careful scrutiny of the facts surrounding the employee's declaration. The Ninth Circuit has written a concise summary of the *Connick* test:

> Speech by public employees may be characterized as not of "public concern" when it is clear that such speech deals with individual personnel disputes and grievances and that the information would be of no relevance to the public's evaluation of the performance of governmental agencies.... On the other hand, speech that concerns "issues about which information is needed or appropriate to enable the members of society" to make informed decisions about the operation of their government merits the highest degree of first amendment protection.

*McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983). In other words, the role of the whistle-blower merits protection; the expressions of personal dissatisfaction by a discontented employee do not.

We imagine that at times this line would be difficult to draw, as the part of a "good government" partisan is no doubt very attractive as the last refuge of the incompetent or discontented. But no such difficulty is present here. We discern nothing in Murray's remarks that would enrich the public's store of appropriate knowledge on the operation of the FBI or which would in any way relate to matters of general public concern. Rather, his remarks appear to be an example of the quintessential employee beef: management has acted incompetently. Perhaps it did—the furlough plan seems less than Solomonic. But the furlough plan was purely a labor relations matter, an arrangement of employees under which some would win and some would lose. Its connection to the matters of public concern *Connick* envisioned does not even qualify as remote. If *Connick*'s rule could be bypassed by the arguments that Murray raises—that public monies and government efficiency are involved—*Connick* would stand for nothing. We refuse to eviscerate so recent a holding.

■ Murray recognized the difficulty inherent in his attempt to distinguish *Connick* and thus included in his arguments the position that *Connick* allows for an exception to its rule. He cites the Court's statement that when an "employee speaks not as ·a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, *absent the most unusual circumstances,* a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency." *Connick, supra,* 103 S.Ct. at 1690 (emphasis added). The Supreme Court offered no clue as to what might constitute the "most unusual circumstances" sufficient to trigger this exception. Murray relies upon his choice of forum: an all employees meeting called by the employers. We do not regard such a conference as out of the ordinary, much less "most unusual." Murray asserts that the "federal government, as an employer, should not be heard to say that it is interested in promoting a system whereby managers can ask employees for their opinions relating to an agency policy, and thereafter pretextually discipline the employee for that opinion." Brief for Murray at 23. But Murray's own account leaves no doubt that the all employees' meeting was conceived as a legitimate attempt by those in charge at the Field Office to bring employee reactions to the furlough plan to the attention of the management. The events which followed cannot fairly be described as a deliberate coaxing-out of dissent for the purpose of initiating reprisals against the dissenters. Murray's comments contained a very serious accusation of coercion leveled at Laken. It was this accusation which set in motion the further meetings which eventually resulted in Murray's discipline. We refuse to label this series of events as "most unusual circumstances" sufficient to displace Murray's grievance from the category of "individual personnel disputes and grievances." *McKinley, supra,* 705 F.2d at 1114.[2]

## B. *The Fifth Amendment Claim.*

■ Murray asserts a Fifth Amendment claim which alleges that he was denied

2. While my colleagues would not reach the issue I consider to be applicable, I feel compelled to note that defendants raise a significant question of their immunity from causes of action such as this one. Defendants pressed this argument before the District Court, but the District Court rejected it in cursory fashion, stating: "There is ... genuine dispute over whether defendants' actions violated clearly established constitutional rights." J.A. at 28. The Supreme Court, however, in 1982 noted "that bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow v. Fitzgerald,* 457 U.S. 800, 817–818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Court established that government officials

generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person might have known.

*Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The principle announced in *Harlow* was just forcefully reaffirmed, and applied by the current term of the Supreme Court to establish the immunity of state officials from a suit, brought under section 1983, in which· a plaintiff claimed unlawful dismissal from his public employment. *See Davis v. Scherer,* —— U.S. ——, ——, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984).

Under the *Harlow* standard for official immunity, if "the law was not clearly established at the time the contested conduct occurred, the inquiry ceases." *Zweibon v. Mitchell,* 720 F.2d 162, 168 (D.C.Cir.1983). "Our task after *Harlow,* therefore, is to measure [the defendants'] conduct by reference to clearly established law at the time [this conduct] occurred." *Id.* Similarly, "if the trial judge determines that the law ·was not clearly established at the time the conduct occurred, the inquiry ceases and the official is entitled to summary judgment." *Hobson v. Wilson,* 737 F.2d 1, 25 (D.C.Cir.1984).

This examination of an immunity claim, whether by the trial court or on appeal, is never an easy task, but it cannot be shuffled off. While *Connick*'s standards had not been made explicit at the time of Murray's discipline, that case's review of the law which controlled in 1981 leaves no doubt in my mind that these defendants enjoyed immunity at the time of their actions regarding Murray. The case law leading up to *Connick* had not approached a declaration of the kind of protection which Murray now claims. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471

procedural protections guaranteed him by statute and FBI regulations. The district court dismissed this claim, stating:

> [E]ven if Murray does have such property and liberty interests, he was given all the process that was due under the circumstances. Due process requirements vary according to the severity of the threatened loss. *See, e.g., Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In Murray's case, the major disciplinary action taken against him was a fourteen-day suspension without pay. Prior to that suspension he was notified of the proposed disciplinary action and given the opportunity to respond orally and in writing to accusations on which the action was based. Such notice and opportunity to be heard was sufficient to satisfy due process requirements under the circumstances. *See, e.g., id., Foster v. Ripley,* 645 F.2d [1142, 1150 (D.C.Cir.1981)].

J.A. at 29. We agree.

Murray relies in part on procedural guarantees allegedly owed him under 5 U.S.C. §§ 7511(a)(1)(B), 7512(2), 7513(b), and the FBI's regulations. J.A. at 46–58. We note initially that Murray's suspension is not governed by the subchapter he cites. *See* 5 U.S.C. § 7512(2) ("This subchapter applies to ... (2) a suspension for more than 14 days ...."). Murray complains that he was denied an appeal to the Merit Systems Protection Board ("MSPB"), but the MSPB is barred by statute from hearing cases involving such limited suspensions. *Id.* He also complains that he was denied a right to counsel, but the regulation he points to specifically provides that "[i]f allegations are possibly criminal in nature, the employee has the right to seek counsel in the same vein as any other individual." J.A. at 47. The actions for which Murray was disciplined were not criminal in nature. As for the allegations that he was denied notice of an impending disciplinary action, Murray's complaint admits that he was given this notice on December 1, 1981. J.A. at 9–10. Murray asserts more plausibly that procedural protections promised him were not delivered. *See supra* at 5–6. But we cannot say that the notice and opportunity to respond accorded him fell short of the governing laws and regulations.

### C. The Conspiracy Claim.

Murray complains that, because his conspiracy claim implicated the Constitution, the District Court improperly dismissed that cause of action. Our discussion above reveals that no constitutional violation occurred, so this issue need not be addressed.

### D. The District Court's Denial of Murray's Motion to Amend His Complaint.

This too is an inconsequential issue. We have reviewed the proposed amendments.

---

(1977), *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). *Connick* makes clear that public employees had never enjoyed the ability to "constitutionalize [every] employee grievance." *Connick,* 103 S.Ct. at 1694. It was manifestly *not* established in 1981 that complaints about a furlough plan equaled comment on a matter of public concern and was thus protected under the First Amendment. I would refuse to saddle these defendants with responsibility for knowledge of a standard that had never been established and which was, in fact, explicitly rejected only two years after the events occurred. The essence of qualified immunity is the necessity of protecting government officials from charges that they knowingly violated standards that were in fact unknowable. "A public official should not be made to guess, at his peril, whether distinctions as rarefied as those appellants proffer might one day subject him to personal liability for his official acts." *Zweibon,* 720 F.2d at 170. Government officials must be granted the ability to pass unmolested through bogs of murky legal precedent. They must not become prey to every hypothesis of what the law might have come to forbid had it eventually developed along certain lines. When the law is clear, and an official's duties delineated, then he will not be able to rely on the immunity defense. But we must not and do not demand that every government official become skilled in guessing the future path of the law. It is uniquely the responsibility of the trial court to carefully consider the defense of immunity when it is offered, else it will be no more than a rhetorical bandage, useless in preventing harm to public servants. It is true that we can and do decide this case on a different basis, but it is no less a responsibility to point out past errors of the District Court to the end that they not be repeated again.

J.A. at 33–34. Had they been allowed, they would not have affected the outcome of the case.

### E. *Conclusion.*

The Supreme Court has taken a position that the First Amendment shall not be pressed into service as an alternative means of resolving employee grievances. Appellant Murray attempts to skirt the Court's instruction. We, however, cannot. The decision by the District Court is affirmed.

*Judgment accordingly.*