*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0321P (6th Cir.)
File Name: 03a0321p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

STEPHEN B. HIMMEL,
　　*Plaintiff-Appellant,*

　　*v.*　　　　　　　　No. 01-4277

FORD MOTOR COMPANY,
　　*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00851—Sandra S. Beckwith, District Judge.

Argued: April 30, 2003

Decided and Filed: September 8, 2003

Before: MOORE and ROGERS, Circuit Judges; KATZ,
District Judge.[*]

———————

**COUNSEL**

**ARGUED:** Robert J. Hollingsworth, CORS & BASSETT,
Cincinnati, Ohio, for Appellant. David G. Holcombe,

———————

[*] The Honorable David A. Katz, United States District Judge for the
Northern District of Ohio, sitting by designation.

BAKER & HOSTETLER, Cincinnati, Ohio, for Appellee.
**ON BRIEF:** Robert J. Hollingsworth, Paul R. Moran, CORS
& BASSETT, Cincinnati, Ohio, for Appellant. David G.
Holcombe, Amy L. Garrard, BAKER & HOSTETLER,
Cincinnati, Ohio, for Appellee.

　MOORE, J., delivered the opinion of the court, in which
KATZ, D. J., joined. ROGERS, J. (pp. 16-23), delivered a
separate dissenting opinion.

———————

**OPINION**

———————

　KAREN NELSON MOORE, Circuit Judge. Plaintiff-
Appellant Stephen B. Himmel ("Himmel") appeals the district
court's grant of summary judgment to Defendant-Appellee
Ford Motor Company ("Ford"). Ford terminated Himmel's
employment as the Supervisor of Labor Relations, Hourly
Personnel, and Safety in October 1997. According to
Himmel, prior to his termination, he had complained about
the labor practices that violated Section 302 of the Labor
Management Relations Act ("LMRA"), 29 U.S.C. §186,
alleging: (1) Ford improperly agreed with the United Auto
Workers ("UAW") that ten percent of its hires would be
referrals from UAW officials; (2) Himmel was forced by Ford
to hire a referral from the UAW's National Ford Department;
and (3) Ford improperly settled two grievances with awards
of back pay. Himmel filed suit against Ford, alleging that he
was wrongfully terminated in retaliation for his complaints
and that such termination violated the public policy of Ohio
as expressed in Section 302 of the LMRA. The district court
granted Ford's motion for summary judgment, reasoning that
Himmel's discharge would not jeopardize Ohio public policy
because Himmel had both participated in Ford's violations
and committed his own independent violations of the LMRA.
Himmel filed a timely notice of appeal.

Because the illegal conduct of an employee does not automatically bar his action for a wrongful discharge in violation of public policy under Ohio law, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

Beginning in 1977, Himmel was employed at Ford's Sharonville, Ohio, transmission plant ("Sharonville"), first as a Labor Relations Specialist and then as Supervisor of Labor Relations, Hourly Personnel, and Safety. In his capacity as a supervisor, Himmel was responsible for all matters involving hourly workers. Because the UAW represented Ford's hourly personnel at Sharonville, Himmel served as Ford's representative to the Union and was responsible for the daily administration of the collective bargaining agreements between Ford and the UAW.

According to Himmel, during his tenure as a supervisor, he complained to Ford about Ford's improper favoritism to UAW officials. Specifically, Himmel maintains that he objected to three instances of Ford's alleged improper conduct: (1) Ford's agreement with the UAW that ten percent of its nationwide hiring would be referrals from UAW officials; (2) Ford's decision to hire Richard Forste ("Forste") after Himmel refused to give priority status to Forste as a referral from the UAW's National Ford Department; and (3) Ford's handling of the settlement of an employee grievance.

According to Himmel, Ford has long agreed that ten percent of its national hiring would be comprised of referrals from individual UAW officials. The UAW's National Ford Department gives referrals to Ford's World Headquarters, which in turn passes the reference along to individual plants. Ford forces its plants to give priority status to these referrals, according to Himmel, by refusing to support any plant that refuses to do so when that plant is the object of Union

pressure. Himmel maintains that he complained about this ten-percent policy to his superiors on numerous occasions, although the content and time of these complaints is unclear.

In September 1996, Ford ordered Sharonville to hire a National Ford Department referral after Himmel had expressly declined to hire the referral and filled all available positions with other hires. When three journeyman electrician positions became available in June, Himmel opted to promote three qualified employees already working at Sharonville rather than to hire Forste, a National Ford Department referral. The National Ford Department informed Himmel that they considered his hiring decision "a slap in the face." Joint Appendix ("J.A.") at 135-36. Himmel had promoted the three Sharonville employees without first requiring their completion of a skilled-trades test, and the National Ford Department threatened to make pre-hiring testing an issue at Ford's upcoming national negotiations with the UAW unless Sharonville found a way to hire Forste. Although there were no open positions remaining at Sharonville, Ford's Powertrain Operations division decided to hire Forste.[1] Himmel complained to his Powertrain Operations supervisors about the forced hire and filed a written complaint with Ford's Office of General Counsel.[2] In spite of Himmel's complaints, Ford ordered Sharonville to hire Forste, and Himmel complied with the order.

While Ford was deciding whether to hire Forste, two journeymen electricians at a nearby Ford plant asked to be transferred to Sharonville plant. The electricians, Frank

---

[1] Forste was not a UAW member and did not submit an employment application, interview for the position, or take a skilled-trades test.

[2] Himmel did not specifically allege in his complaints that Ford's conduct was illegal, instead complaining that the National Ford Department had no standing to file a grievance and that the National Ford Department had no good reasons to oppose his hires — three UAW members — when its own referral was not a UAW member.

Kuykendall ("Kuykendall") and Ruth Jackson ("Jackson") filed grievances against Ford through the UAW in October 1996. According to Kuykendall and Jackson, the collective bargaining agreements between Ford and the UAW required Sharonville to prefer Ford employees over non-Ford employees applying for an open electrician position. Jackson also filed a grievance against Ford and the UAW with the National Labor Relations Board ("NLRB") in December 1996. When Ford finally transferred Kuykendall and Jackson to Sharonville in February 1997, they continued to dispute the issue of back pay. In June 1997, Ford agreed to pay both Kuykendall and Jackson for 420 hours of back pay, the number of hours that Forste had worked between the date of his hire and the day before Kuykendall and Jackson were transferred to Sharonville.

Himmel alleges that, upon learning of the settlement, he immediately complained to his boss that "it 'stinks' and is 'illegal.'" J.A. at 176 (Himmel Aff.). Moreover, a few weeks later, Himmel informed a Powertrain Operations official that the settlement violated "federal law" when she telephoned him to ask whether he had issued the settlement payment. According to Himmel, Ford had agreed prior to the settlement that only Jackson, the more senior employee who would have received Forste's position, had standing to grieve Ford's decision to hire a non-Ford-employee applicant at Sharonville. According to Himmel, Kuykendall was not entitled to a remedy, and likely received one only because he was married to the niece of the National Ford Department official who negotiated the settlement. Moreover, Himmel maintained that under the terms of the labor contract the back pay award should have extended back only to the UAW's latest refusal of Ford's settlement offer, not to Forste's start date.

A few days after Himmel initially complained about the impropriety of the Kuykendall settlement, Ford began investigating Himmel to determine whether he had improperly promoted UAW collective bargaining

representatives.[3] According to Ford, it concluded that Himmel had committed seven separate violations of Ford policy which could have subjected Ford to criminal and/or civil liability. Ford decided that discharge was the appropriate penalty and terminated Himmel's employment in October 1997.

Himmel filed an action against Ford in October 1999, alleging a single count of wrongful discharge based on Ohio's public policy exception to the employment-at-will doctrine. Himmel argues that Ford's asserted grounds for his discharge were pretextual and maintains that the promotions he gave were legitimate and previously approved by Ford labor officials. According to Himmel, Ford actually terminated him in retaliation for his complaints about Ford's conduct in violation of Section 302 of the LMRA, which prohibits employers and their agents from providing "any . . . thing of value" to a union or union official. 29 U.S.C. § 186(a). Himmel maintains that Ford's violations implicated Ohio public policy and therefore permitted his wrongful discharge action.

The district court granted Ford's motion for summary judgment, concluding that Himmel's recovery for wrongful discharge was barred by Himmel's participation in Ford's violations of Section 302 and by his own violations of Section 302. Himmel filed a timely notice of appeal.

## II. ANALYSIS

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Equitable Life Assurance Soc'y of the U.S. v. Poe*, 143 F.3d 1013, 1015 (6th Cir. 1998). Summary judgment is

---

[3] Although the parties discuss at length the facts surrounding Ford's decision to terminate Himmel, these facts are not dispositive to our resolution of the case.

appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A dispute over a material fact is not considered "genuine" unless "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotation omitted). In deciding whether summary judgment was appropriate, we view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In reviewing a grant of summary judgment, we employ the same legal standard that the district court applied. *Equitable Life Assurance Soc'y*, 143 F.3d at 1015. Because we are sitting in diversity,[4] *see* 28 U.S.C. § 1332, we apply the law, including the choice of law rules, of the forum state. *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Here the parties agree that the substantive law of Ohio governs. Because the question at issue has not yet been resolved by the Ohio courts, we must attempt to predict what the Ohio Supreme Court would do if confronted with the same question. *Stalbosky v. Belew*, 205 F.3d 890, 893-94 (6th Cir. 2000).

## B. *Greeley* Claims: Ohio's Public Policy Exception to Employment at Will

Ohio refers to claims of wrongful discharge in violation of public policy as *Greeley* claims. *See Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990), *overruled in part by Tulloh v. Goodyear Atomic Corp.*, 584 N.E.2d 729 (Ohio 1992). In *Greeley*, Ohio first recognized

---

[4]Diversity exists between Himmel, an Ohio citizen, and Ford, a business that is incorporated in and has its principal place of business in states other than Ohio.

that "public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason which is prohibited by statute." *Id.* at 986. The Ohio Supreme Court gradually expanded the scope of *Greeley* actions, ultimately articulating four elements that a plaintiff must prove to establish a public-policy claim:

1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).

4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995) (quoting Henry H. Perritt, Jr., *The Future of Wrongful Dismissal Claims: Where Does Employer Self Interest Lie?*, 58 U. Cin. L. Rev. 397, 398-99 (1989)).

To decide whether summary judgment for Ford was improper, we must consider whether Himmel has established a genuine issue of material fact as to each element of his *Greeley* claim. As an initial matter, we note that the issue of clarity has been resolved in Himmel's favor; Ford concedes on appeal "that Section 302 of the LMRA embodies a sufficiently clear public policy to serve as the foundation for a wrongful discharge claim." Ford Br. at 33-34. Moreover, it is clear that Himmel has established a genuine issue of material fact as to both causation and overriding justification. *See Collins*, 652 N.E.2d at 658 (explaining that, under Ohio

law, these two *Greeley* elements are questions of fact for the jury). With respect to causation, Ford argues that Himmel was terminated for violating Ford company policy and the policy of the LMRA, but Himmel has presented contrary evidence suggesting his termination was motivated by Himmel's complaints about Ford's violations of the public policy of the LMRA. Similarly, Ford has introduced evidence that Himmel engaged in wrongful conduct which amounted to a legitimate overriding business justification for dismissing Himmel. Himmel counters this argument with evidence that his conduct was in accord with company policy and the law. In light of the parties' disputes about the facts and how to interpret them, we conclude that Himmel established a genuine issue of material fact as to the causation and overriding justification elements of his *Greeley* claim. Therefore, our inquiry will focus on the jeopardy element of Himmel's *Greeley* claim.

### 1. Jeopardizing Ohio's Public Policy

The Ohio Supreme Court characterizes the jeopardy inquiry as a question of law for the court. *Id.* Therefore, for summary judgment purposes, we must determine whether dismissing employees under the circumstances of Himmel's dismissal would jeopardize the clear pubic policy of Section 302. Ohio has yet to adopt a clear analytical framework for analyzing jeopardy, and discussions of this element by Ohio courts are often quite brief. However, Henry H. Perritt, Jr., who originally articulated the analytical framework that was subsequently adopted by the Ohio Supreme Court for *Greeley* claims, has identified three steps of jeopardy analysis: (1) determine "what kind of conduct is necessary to further the public policy" at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal. Perritt, *supra*, at 408. Given the Ohio Supreme Court's reliance on Professor Perritt's articulation of the jeopardy element in *Collins* and subsequent cases

involving *Greeley* claims, we believe that Perritt's framework of jeopardy analysis provides guidance in our analysis of the facts at hand.

Section 302 of the LMRA provides that "[i]t shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value . . . to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce." 29 U.S.C. § 186(a). When Congress enacted Section 302, it was "concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control." *Arroyo v. United States*, 359 U.S. 419, 425-26 (1959) (footnotes omitted); *see Turner v. Local Union No. 302, Int'l Bhd. of Teamsters*, 604 F.2d 1219, 1227 (9th Cir. 1979) ("The dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers."). In short, the public policy of Section 302 can be described as preventing corruption in union-employer relationships.

Corruption in union-employer relationships will often not come to light in the absence of reporting by an insider in the process. Therefore, to achieve the policy goal of Section 302, employees must be in a position where they are able to articulate their observations and suspicions of such corruption. *See, e.g., Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 324 (Ohio 1997) (suggesting that Ohio needs employees to report legitimate health and safety concerns to further Ohio's policy favoring workplace safety), *abrogation on other grounds recognized by Krickler v. Brooklyn*, 776 N.E.2d 119 (Ohio Ct. App. 8th Dist. 2002); *Jamison v. American Showa, Inc.*, 99CAE-03-014, 2000 WL 1404, at

*11 (Ohio Ct. App. 5th Dist. Dec. 16, 1999) (noting that employee reporting of an employer's environmental violations benefits "the health and safety of an entire community"). Reporting is essential to furthering the policy goals of a statutory provision like Section 302 because one can imagine any number of circumstances where corruption would likely go unnoticed in the absence of employee complaints.

Having determined that employee complaints of conduct thought to violate Section 302 are essential to furthering the purpose of that provision, we proceed to evaluate whether Himmel's conduct fell within the scope of employee complaints protected by the policy of preventing corruption in union-employer relationships. No Ohio law suggests that Himmel needed to invoke a specific statute as a basis for his complaints of wrongdoing at the time he complained to Ford. Moreover, no Ohio law suggests that, at the time of his complaint, an employee must be certain that the seemingly inappropriate conduct is actually illegal. *See Fox v. City of Bowling Green*, 668 N.E.2d 898, 902 (Ohio 1996) (explaining in the context of the Ohio Whistleblower Statute, Ohio Revised Code § 4113.52, that "requir[ing] that an actual violation must occur for a whistleblower to gain protection leads to nonsensical results which are unjust, unreasonable, and contrary to the spirit of the statute and public policy"). Rather, an employee simply must have had a "good faith belief that [his] complaint was valid" at the time of his complaint. *Kulch*, 677 N.E.2d at 324; *Pytlinski v. Brocar Prods., Inc.*, 760 N.E.2d 385, 386 (Ohio 2002) (allowing a *Greeley* claim where an employee complained of conduct that he "believed to be in violation of the Occupational Safety and Health Administration . . . regulations"). Employees should be encouraged to complain about their employers' potentially illegal conduct, even when they are not certain that the conduct is improper as a matter of law. Requiring employees to do legal research prior to making a complaint would contravene Ohio's public policy by depriving employees of a remedy for wrongful discharge whenever they object to

apparently inappropriate conduct before doing adequate research.

Viewing the facts in the light most favorable to Himmel, we conclude that Himmel's complaints about the ten-percent policy, the hiring of Forste, and the Kuykendall settlement were conduct furthering the policy of Section 302.[5] These complaints all implicate Ford's relationship with the UAW and involve Ford's alleged preferential treatment of UAW referrals and employees with UAW connections. Because all three instances of Ford's alleged misconduct implicate the potential corruption of union-employer relationships, Himmel's objections constitute conduct within the scope of Section 302.

Finally, we recognize that permitting Ford to dismiss Himmel in retaliation for Himmel's complaints about Ford's potential corruption of union-employer relations would discourage other Ford employees from complaining about future conduct by Ford that threatened further to corrupt those relations. *See Kulch*, 677 N.E.2d at 324 (explaining that allowing an employer to dismiss an employee for filing a complaint about unlawful practices would deter other employees from reporting legitimate concerns); Perritt, *supra*, at 408 ("The third substep [of jeopardy analysis] is to decide if the threat of dismissal is likely in the future to discourage

[5] Ford does not counter Himmel's factual allegations that he objected to the ten-percent policy, the Forste hiring, or the Kuykendall and Jackson settlements. Instead Ford suggests that Himmel's conduct did not fall within the scope of Section 302's policy because (1) Himmel participated in Ford's alleged wrongdoing, (2) Himmel engaged in conduct equally violative of Section 302's policy against corruption in union-employer relations, and (3) Ford's conduct of which Himmel complained was not actually illegal. At issue in this inquiry, however, is only Himmel's conduct in complaining about Ford's potentially illegal activities. Himmel's own alleged wrongdoing is not relevant to our analysis of whether his complaints fell within the scope of conduct protected by Section 302. Moreover, as discussed above, Himmel was not obligated to do legal research before complaining about apparent corruption.

the employees from engaging in similar conduct. The answer to the third question almost always will be 'yes.'").

Therefore, because employee reporting of employer activities that might violate Section 302 is conduct necessary to further the policy of Section 302, because Himmel's conduct falls within the scope of this policy, and because Ford's dismissal of Himmel would discourage other employees from complaining about conduct potentially corrupting union-employer relations, we conclude that the facts viewed in the light most favorable to Himmel establish under Ohio law "[t]hat dismissing employees under circumstances like those involved in [Himmel's] dismissal would jeopardize the public policy" behind Section 302. *Collins*, 652 N.E.2d at 657 (internal quotation omitted).

### 2. Conduct Barring a *Greeley* Claim

Although the above analysis indicates that Himmel has established jeopardy for purposes of his *Greeley* claim, Ford nevertheless maintains that Himmel's alleged violations of Section 302, as well as his participation in Ford's alleged violations of Section 302, preclude this court from finding that the jeopardy element is met. According to Ford, this court should therefore affirm the district court's grant of summary judgment for Ford on the jeopardy element of Himmel's *Greeley* claim.

The jeopardy element of a *Greeley* claim takes into account a plaintiff's conduct only to the extent necessary to determine whether it falls within the scope of conduct necessary to further the public policy at issue. *See* Perritt, *supra*, at 408. In this case, employee complaints of employer activities that are contrary to the public policy of Section 302 are essential to furthering the purposes of that statute. We therefore look only at Himmel's reporting of complaints; it is not necessary for the purposes of jeopardy analysis to examine any of Himmel's allegedly improper conduct. Moreover, because Ohio describes the jeopardy inquiry as a question of law for

the court, *Collins*, 652 N.E.2d at 658, at the summary judgment stage, the jeopardy inquiry serves only to determine whether public policy would be jeopardized by permitting an employer to dismiss an employee on the facts viewed in the light most favorable to a plaintiff employee.

We do recognize that Himmel's alleged wrongful conduct may be relevant to the resolution of his *Greeley* claim in other respects, however. Himmel's ability to recover under *Greeley* will be impacted by his own alleged violations of Section 302 because such violations are likely relevant to the elements of causation and overriding justification. It would be difficult for an employee to show that his dismissal was "motivated by conduct related to the public policy" at issue if his employer could point to the employee's illegal conduct as the cause for dismissal. *Collins*, 652 N.E.2d at 657 (internal quotation omitted). Similarly, it would be difficult for an employee to establish the absence of a legitimate overriding business justification for his termination if the employee has violated company policy and federal law. In this sense, Ford's allegations that Himmel violated Section 302 are relevant to the outcome of Himmel's *Greeley* claim. However, because Himmel has demonstrated a genuine issue of material fact with respect to the elements of causation and overriding justification, summary judgment was not appropriate.

Because we do not believe that Ohio law regards either complicity in an employer's wrongdoing or independent wrongdoing as an automatic bar to *Greeley* claims, the district court erred by concluding that Ford was entitled to summary judgment.

### III. CONCLUSION

For the reasons explained above, we conclude that the district court erred in granting Ford summary judgment on grounds that Himmel's *Greeley* claim was barred by Himmel's own alleged violations of Section 302. Himmel has established jeopardy as a matter of law and, viewing the

facts in the light most favorable to Himmel, we conclude that there are genuine issues of material fact as to causation and overriding justification. For these reasons and because the clarity of Section 302's policy is not in dispute, we **REVERSE** and **REMAND** the district court's judgment for further proceedings consistent with this analysis.

---

**DISSENT**

---

ROGERS, Circuit Judge, dissenting. I respectfully dissent, because in my view Himmel has failed to establish the jeopardy element of *Greeley*. That element requires us to determine whether "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy." *Collins v. Rizkana*, 652 N.E.2d 653, 657 (Ohio 1995).

As an initial matter, I would apply the standard for making the jeopardy determination that the Ohio Supreme Court has in fact used in a similar case, rather than one drawn from Professor Perritt's law journal article, although the analysis under either should probably lead to the same conclusion. In *Wiles v. Medina Auto Parts*, 773 N.E.2d 526 (Ohio 2002), the Ohio Supreme Court applied the following standard: a *Greeley* plaintiff must show that disallowing his or her claim would seriously compromise the objectives of the law that provides the policy source for the claim. *See id.* at 531 ("[W]e must assess whether the absence of a cognizable *Greeley* claim based solely on a violation of the FMLA would *seriously compromise the Act's statutory objectives* by deterring eligible employees from exercising their substantive leave rights." (emphasis added)).

Given that the intent of Section 302 of the LMRA—the statute whose policy Himmel relies on—is essentially to prevent employers and unions from corrupting one another, the inquiry in the present case should concern whether denying Himmel's *Greeley* claim would seriously compromise Section 302's policy against corruption. Himmel has not adequately shown that it would do so.

An anti-corruption policy is clearly furthered when an employee exposes his employer's corrupt practices to an

outside enforcement authority. It may also be furthered, albeit less certainly, when an employee exposes such practices to authorities within the company, and Ohio courts allow *Greeley* claims in such cases. *See Pytlinski v. Brocar Prods.*, 760 N.E.2d 385, 388 n.3 (Ohio 2002). This assumes, however, that the employee is truly blowing the whistle, telling people who have the power to change things that something illegal is going on, so that those people can choose either to correct the problem or become culpable themselves. But if an employee complains about a practice because he thinks it a poor *policy choice*, say, and alleges no corruption or illegality, then those to whom he complains will presumably have no reason to suspect such evils, and Section 302's anti-corruption policy will not be furthered by his complaint.

A preliminary issue, then, is the degree of specificity with which an employee must complain of his or her employer's wrongdoing. While Ohio cases have not discussed this matter explicitly, the way that the Supreme Court of Ohio has treated certain cases,[1] as well as its generally expansive attitude toward *Greeley* claims,[2] indicate that an Ohio court would not require that Himmel have specifically referred to the statute

---

[1] For example, according to the factual statement in *Fox v. City of Bowling Green*, 668 N.E.2d 898 (Ohio 1996), the plaintiff reported "that he believed *some laws* may have been violated," *id.* at 900 (emphasis added), and this was apparently enough for a Whistleblower Statute claim. Similarly, in *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308 (Ohio 1997), the court was not deterred by the fact that OSHA found the employer to be in violation of regulations other than those the plaintiff had accused the employer of violating. *See id.* at 310.

[2] *See Kulch*, 677 N.E.2d at 328 (continuing the expansion of the *Greeley* cause of action by holding that the Whistleblower Statute does not preempt *Greeley* claims based on whistleblowing). *But see Wiles*, 773 N.E.2d at 534 (holding that a plaintiff may not bring a *Greeley* claim that is based solely on the public policy embodied in the federal Family and Medical Leave Act, because the remedies provided in the federal act are adequate).

---

at issue. More general allegations may suffice, but to find a serious implication of a statute's policy, the employee should at least have alleged that the employer has been acting illegally in a context that shows a direct concern with the policy underlying the statute. Anything less than this would provide a public policy cause of action protecting complaints that do not promise to alert authorities about illegality, and hence do not implicate public policy.

In the present case, Himmel brings forward three things that he complained about: Ford's unwritten agreement with UAW that 10% of Ford's nationwide hiring will be referrals from individual UAW officials ("10% policy"), the hiring of Forste, and the settlement with Kuykendall. Regarding the 10% policy, the record indicates only that Himmel "complained" to certain superiors within Ford.[3] Similarly, the record is largely silent as to why Himmel initially opted not to hire Forste, and though Himmel complained later about being required to do so,[4] there is no indication that his complaints amounted to anything more than "the quintessential employee beef," that "management has acted incompetently." *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984). The following excerpt from Himmel's deposition is pertinent:

---

[3] The only reference I find regarding Himmel's motivation for not hiring Forste is a statement by Rich Freeman, a Labor Relations Specialist at Ford's Powertrain Operations Division, who said that Himmel opted against Forste because he preferred "insiders" to "outsiders." *See* J.A. at 189.

[4] The record indicates that Himmel did not complain that Ford's action was illegal. Instead, he questioned why Ford would listen to the UAW's National Ford Department ("NFD") when the latter had no standing to file a grievance, and he argued that it was illogical for the NFD to oppose his hires, given that all three were UAW members and Forste (as an applicant, only) was not a UAW member. *See* J.A. at 405–06.

Q.   The complaint that you made to [Powertrain Operations Division officials, about Forste's hiring], did it include a reference to any specific violation of the labor laws, or Labor Management Relations Act, or any other specific labor law?

A.   Specifically, no, but I think I may have mentioned that [Forste] wasn't covered under our contract either from an EEO or NLRB standpoint.

Q.   That was not a complaint that the company in doing this is violating such and such a statute, that was not the nature of your complaint?

A.   I didn't say that.

Q.   Did you say that with respect to any complaints or objections that you may have made concerning any of the company's actions at any time?

A.   Oh, I think I said it with respect to the [Kuykendall/Jackson] grievance settlement, that I thought that was improper.

Q.   Question was, [did you allege that it was] a violation of a specific statute[?]

A.   I complained that it violated federal law.

J.A. at 407–08. This establishes that Himmel complained of illegality only in relation to the Kuykendall settlement, and even then his complaint concerned only "federal law." On the basis of this, it is apparent that the policies of Section 302 would not be seriously jeopardized if we disallowed Himmel's *Greeley* claim based on his complaints about the 10% policy and the Forste hiring.  With respect to the Kuykendall settlement, however, Himmel's complaints in that instance at least invoked "federal law."  It is questionable whether this is sufficient to assert a *Greeley* claim.  Assuming that it is, the inquiry then becomes whether Himmel

reasonably believed[5] that Ford's settlement payment to

---

[5] As the majority notes, an employee bringing a *Greeley* claim need not show that his or her employer was actually violating the law in question; rather, the employee need show only that the belief was reasonable.  The rationale for the standard is that the alternative standard—to require a whistle-blowing employee to show that he or she reported an *actual* violation—would mean that "each whistleblower would have to become equal parts policeman, prosecutor, judge, and jury. A whistleblower could never be certain that a statute has been *actually* violated until the perpetrator was found guilty in court." *Fox*, 668 N.E.2d at 902 (emphasis in original).

I would add, however, that it makes sense to apply the reasonable belief standard more strongly where the law is clear and the employee is mistaken as to the *facts*, than to a situation where the facts are clear and the employee is mistaken as to the *law*.  Where factual matters are concerned, it would be burdensome to require that a concerned employee investigate until he or she was positive that something had happened. Hence the law protects an employee's reasonable belief that certain actions occurred—actions that, if shown, would be clearly illegal. Interestingly, the *Fox* court, in illustrating why a reasonable belief standard makes sense, posited just such a situation:

> Suppose that a dispatcher of a taxi company is told by an on-duty driver that the driver is drunk.  The employee believes that the driver does indeed sound intoxicated.  Does the dispatcher need to chase down the driver, perform field sobriety, breathalyzer and blood tests before he may report to his supervisor that the driver is driving while intoxicated?

*Id*.  In situations like this, the rationale underlying the reasonable belief standard is in full force, and should be applied liberally.

On the other hand, where the employer admits to what the employee claims it is doing (and hence the facts are undisputed), and the dispute is instead over whether what the employer is doing is illegal, the reasonable belief standard makes less sense because the employee is merely arguing with the employer about something the employer already knows about, and the employee is not "exposing" anything. (On the other hand, where the employee does not merely complain of illegality to his or her supervisors, but reports the suspected violation to some regulatory entity *outside* the employer, the reasonable belief standard should apply just as strongly to legal mistakes.)

The Ohio court decisions, then, could also be read to allow *Greeley* claims where an employee reasonably believes that the employer has done something, where if the employer actually did it, the employer would be

Kuykendall violated Section 302.

Ford argues that the settlement could not have violated Section 302 because an employer's conferral of an "intangible" benefit—here, union official George Mason's satisfaction in securing an allegedly-improper settlement payment for his niece's husband—cannot constitute a "thing of value" under that section. Ford's authority for this proposition is *United States v. Cervone*, 907 F.2d 332 (2d Cir. 1990), in which an employer had delivered a bribe through a union official to a third party, and the Second Circuit held that any benefit the union official received from being the conduit for the bribe did not constitute a sufficiently tangible "thing of value." *Id*. at 347. But *Cervone* does not stand for the proposition that an intangible benefit—that is, a benefit that is not in the form of direct material enrichment—can never be a "thing of value"; rather, any benefit received in that case was simply too evanescent. *See id*. ("[I]t is anything but clear what intangible benefit [the union official] received, and that benefit thus seems not only intangible but also unidentifiable."). Further, courts have held that more substantial intangible benefits can qualify, even where (as in *Cervone* and in the present case) the direct material benefit went to a third party. *See United States v. DeBrouse*, 652 F.2d 383, 388 (4th Cir. 1981) (holding that a union official had received a "thing of value" where an employer had obeyed the official's command to deliver weekly payments to a third party "or else," and the official had received the benefit of being able to command the employer's obedience).

The question in third-party beneficiary cases, then, is whether the intangible benefit received by the union was sufficiently substantial. In the present case, the problem is

---

in violation of the law. *See, e.g.*, *Sabo v. Schott*, 639 N.E.2d 783 (Ohio 1994) (holding that a *Greeley* claim was stated where a complaint alleged an act which, "if proven to be true, would constitute conduct on the part of the defendants which violates the public policy of this state").

whether—for purposes of our inquiry into whether the LMRA's anti-corruption policy would be "seriously jeopardized" by denying Himmel's *Greeley* claim—the alleged intangible benefit received by Mason constituted a sufficiently substantial "thing of value" to make Himmel's belief that the Kuykendall settlement payment violated "federal law" a reasonable belief.

In my view the benefit was not sufficiently substantial. In *DeBrouse* the corruptness of the payments was evident because it was a given that the third party who received the payments was in no way entitled to them, and the substantial nature of the "thing of value" was evident in part because the payments were made systematically, week after week. *See* 652 F.2d at 387. In the present case, on the other hand, the third party—Kuykendall—received the money in a settlement, so he had at least an ostensibly legitimate claim of right to it; Mason as a union representative had a duty to do his best to obtain a favorable remedy for a fellow union member; and the payment was a one-time affair. We should be reluctant to conclude that a union official's success in negotiating a settlement of a union member's grievance is a "thing of value," even where the grievance may have been unfounded. In sum, where there is serious doubt as to whether Mason did anything improper, and where any benefit Mason received was too insubstantial to constitute a violation of Section 302, Himmel could not reasonably believe that the settlement was obtained in violation of Section 302.[6]

An additional consideration weighs against finding that Himmel has met the jeopardy requirement for a *Greeley* claim. Namely, the federal statute upon which Himmel's

---

[6]Himmel's complaints about the Kuykendall settlement were concerned more with a dispute about whether the settlement was legal and proper, and not with uncovering facts that the employer would necessarily concede to be illegal. This also cuts against the conclusion that Himmel's accusation was protected under the second prong of *Greeley*. *See* footnote 5, *supra*.

*Greeley* claim is founded, LMRA Section 302, does not contain an explicit ban on retaliation for reporting or complaining about violations. This distinguishes this case from *Kulch*, which found a *Greeley* cause of action based on two statutes, each of which explicitly prohibited adverse actions by employers against employees who report violations. One was the Occupational Safety and Health Act, which explicitly prohibits employer discrimination against employees who report violations, *see* 29 U.S.C. § 660(c); the other was Ohio's Whistleblower Statute, which prohibits discharge for reporting statutory violations to regulatory authorities,[7] *see* Ohio Rev. Code § 4113.52(A)(2); *Kulch*, 677 N.E.2d at 322–23.

Together, these considerations lead me to conclude that Himmel has not established the jeopardy element of his *Greeley* claim, and I would therefore affirm the judgment of the district court.

---

[7]The latter prohibition cannot serve as the basis for a *Greeley* claim in this case, as there is no allegation that Himmel complained to regulatory or enforcement authorities. *See* Ohio Rev. Code § 4113.52(A)(2); *Kulch*, 677 N.E.2d at 315–16.