[Cite as *Mangino v. W. Res. Fin. Corp.*, 2012-Ohio-3874.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

JANET MANGINO

     Appellant

     v.

WESTERN RESERVE FINANCIAL
CORP., dba Western Reserve Group

     Appellee

C.A. No.     11-CA-0050

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.     10-CV-0255

DECISION AND JOURNAL ENTRY

Dated: August 27, 2012

---

WHITMORE, Presiding Judge.

{¶1} Plaintiff-Appellant, Janet Mangino, appeals from the judgment of the Wayne County Court of Common Pleas, granting Defendant-Appellee, Western Reserve Mutual Casualty Company's ("Western Reserve"), motion for summary judgment. This Court affirms.

I

{¶2} Mangino was hired by Western Reserve as a Personal Lines Underwriter II in June 2008. Mangino had approximately 18 years of experience working in the insurance industry. Western Reserve provides extensive in-house training for new underwriters and aims to grant underwriting privileges within 90 days of hire. Mangino obtained her underwriting authority in October 2008, approximately 30 days behind schedule.

{¶3} While Mangino's February 2009 performance review indicated that she met all position requirements, her supervisor did note concerns about her failure to meet deadlines and her overreliance on other underwriters to help manage her work. In April 2009, Mangino's

supervisors again met with her to discuss these concerns. Mangino continued to work with her supervisors on performance goals from April through September 2009. Mangino was never able to meet Western Reserve's turn-around deadlines for new business or change orders.

{¶4} Mangino expressed concern about the lack of support she was receiving from Mary Miller, a Senior Customer Service Representative assigned to Mangino. Miller, according to Mangino, was not timely passing work onto her and would pass along work that Miller herself should have been processing. Mangino cited this lack of support for her failure to meet deadlines. Kaye Risner, Mangino's and Miller's supervisor, instituted a tracking system in April 2009 to monitor when files were passed between Mangino and Miller. This tracking system was a way to ensure Mangino was not being held responsible for any delays caused by Miller. This tracking system remained in effect for the remainder of Mangino's employment.

{¶5} Sometime around June 2009, Mangino found a stack of unprocessed inspection reports buried in a box under Miller's desk. Inspection reports on a property are used to verify that a policy accurately reflects the associated risks and replacement value. Insurance agents are primarily responsible for submitting the correct replacement value, but an inspection report may be ordered at the discretion of the underwriter. Inspection reports should be processed timely because the policy has a 60 day window in which it may be adjusted. After the 60 days, the policy may only be adjusted under certain circumstances or at the annual renewal period.

{¶6} Mangino reported finding the inspection reports to Kara Macko, a Human Resources Generalist. Macko told Mangino to discuss the matter with her supervisor, Risner, which Mangino did. At the beginning of July, Lee Campbell replaced Risner as Mangino's supervisor. Campbell became aware of the inspection reports shortly thereafter. Campbell met with Mangino and Miller and told them to work together to get the reports processed by the

beginning of August. In early August, Mangino's frustration with the inspection reports continued and she requested another meeting with Macko. Fritz Raab, Director of Human Resources, met with Mangino and Macko and informed Mangino that the inspection reports were not a matter for Human Resources. No further discussions were had regarding the inspection reports.

{¶7}   On August 10, 2009, Mangino was placed on a Performance Improvement Plan ("PIP"). The inspection reports were not included in the PIP. As part of this improvement plan, Mangino was to meet weekly with Campbell to help monitor her work flow. Mangino was late for all three meetings that were held before she was terminated. Mangino admitted that she "misspoke" during the second meeting, when she reported that all but two of her change orders had been processed. In reality, 13 of Mangino's change orders had not been completed. After this meeting, Campbell felt that Mangino was no longer credible.

{¶8}   Human Resources and Mangino's supervisors continued to meet throughout September to discuss concerns about Mangino's performance and to track her progress. Mangino did not meet the goals set forth in her PIP. The decision to terminate Mangino was made in late September or early October, approximately two months after the PIP was instituted. Mangino's employment was terminated on October 7, 2009.

{¶9}   Mangino filed suit alleging age discrimination and wrongful termination based on public policy. Western Reserve filed a motion for summary judgment, which the court granted. Mangino now appeals and raises two assignments of error for our review. Mangino limits her challenges to the dismissal of her claim of wrongful termination based on public policy. We, therefore, limit our review accordingly. To facilitate the analysis, we address the assignments of error out of order.

II

<u>Assignment of Error Number Two</u>

THE TRIAL COURT ERRED WHEN IT FAILED TO CONSIDER THE EVIDENCE SUBMITTED BY MANGINO TO ESTABLISH THE "CAUSATION" AND "OVERRIDING JUSTIFICATION" ELEMENTS IN A LIGHT MOST FAVORABLE TO HER AS REQUIRED UNDER OHIO RULE OF CIVIL PROCEDURE 56(C).

{¶10}  In her second assignment of error, Mangino argues that the court erred in granting Western Reserve's motion for summary judgment because it failed to properly analyze her claim for wrongful termination based on public policy.  We disagree.

{¶11}  This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).  To prevail on a motion for summary judgment, the moving party must show:

> (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion when viewing evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party.

*Id.*  The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact.  *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996).  Once this burden is satisfied, the non-moving party bears the burden of offering specific facts to show a genuine issue for trial.  *Id.* at 293.  The non-moving party may not rest upon the mere allegations and denials in the pleadings, but instead must point to or submit some evidentiary material that demonstrates a genuine dispute over a material fact.  *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991).  *Accord Thatcher v. Goodwill Industries of Akron*, 117 Ohio App.3d 525, 531 (9th Dist.1997).

> The traditional rule in Ohio and elsewhere is that a general or indefinite hiring is terminable at the will of either party, for any cause, no cause or even in gross or reckless disregard of any employee's rights, and a discharge without cause does not give rise to an action for damages.

*Collins v. Rizkana*, 73 Ohio St.3d 65, 67 (1995). An exception to this at-will employment doctrine has been recognized by the courts; an employer may not discharge an employee in violation of public policy. *Id.* at 68. To support a claim for wrongful discharge in violation of public policy the plaintiff must meet a four-part test.

1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).

2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).

4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

(Alterations, quotations, and emphasis omitted.) *Id.* at 69-70. The clarity and jeopardy elements are questions of law to be determined by the court, while the causation and overriding justification elements are questions of fact to be decided by the trier of fact. *Id.* at 70. To avoid summary judgment, however, Mangino must establish a genuine issue of material fact as to each of the four elements. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir.2003).

{¶12} Mangino argues that there is a clear public policy "against misrepresentations made by insurers to their insured and misrepresentations made to insurers * * *." Mangino cites to several provisions in Title 39 of the Ohio Revised Code as support for this public policy. Mangino argues that (1) allowing Western Reserve to terminate her employment under the circumstances would discourage other employees from raising concerns about unprocessed

inspection reports; (2) her reporting the inspection reports to Human Resources was the cause of her termination; and (3) Western Reserve lacked an overriding justification for ending her employment.

{¶13} Assuming that there is an applicable public policy and Mangino's termination jeopardizes that public policy, we conclude Mangino has failed to establish a genuine issue of material fact as to the causation element.

{¶14} "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation." *Parnell v. West*, 6th Cir. No. 95-2131, 1997 WL 271751, *2 (May 21, 1997).

Causation By Direct Evidence

{¶15} Mangino presented no direct evidence that her termination was related to the inspection reports. In her deposition Mangino was asked, "[w]ho specifically at the company do you believe considered these inspection reports in evaluating your performance or in terminating your employment?" Mangino responded, "I can't answer that. I don't know." Mangino further testified that there were no witnesses that could help show the inspection reports were the reason for her termination.

{¶16} The concerns about Mangino's performance precede the discovery of the inspection reports. Mangino testified that as early as February 2009, months before the inspection reports were found, she knew she was not meeting the turn-around deadlines and understood that her performance must improve. Her performance, however, did not improve. In April 2009, Mangino had a meeting with her senior supervisor, Portia Wilson, to discuss her continued failure to meet the company's processing deadlines. Mangino testified that the five day deadline for processing new applications is important for several reasons, including billing

and good customer service. Significantly, Mangino acknowledged that during the course of her employment, she *never* met the turn-around deadline for new applications.

{¶17} All of the testimony leads to the conclusion that the inspection reports were not considered in evaluating Mangino's performance. Terry Rhodes, Personal Lines Manager at Western Reserve, testified that he was aware of the inspection reports, but "thought they were being taken care of, and then it was pretty much a nonissue." Campbell testified that inspection reports may be ordered at the discretion of the underwriter, but are not part of Western Reserve's guidelines; the company is not required to order an inspection report on a property. According to Mangino, the company relies on the agent to do the "basic frontline underwriting" and it is the agent, therefore, that is responsible for setting the correct replacement value, which may be verified by the underwriter through an inspection report. Campbell met with Miller and Mangino and told them to work together to get the reports processed. Miller had the authority to process inspection reports on properties below a certain value. Those reports that related to properties above that value were to be processed by Mangino. Campbell requested the reports be completed by the beginning of August, which was prior to Mangino being placed on a PIP. Moreover, Raab and Campbell both testified that the inspection reports were not part of Mangino's PIP.

Causation By Indirect Evidence

{¶18} Mangino argues that the causation element is satisfied by indirect evidence because of the "temporal proximity between her complaints [about the inspection reports] and her termination." The case law, however, does not support the inference of causation by timing alone when several months lapse between the employee's protected activity and termination.

{¶19} "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-274 (2001). *Accord Healey v. Goodyear Tire & Rubber Co.*, 9th Dist. No. 25888, 2012-Ohio-2170, ¶ 19-20. "[T]he interval of two months between the complaint and [the employee's] termination [] dilutes any inference of causation" and cannot justify a finding of causation. *Kipp v. Missouri Hwy. and Transp. Comm.*, 280 F.3d 893, 897 (8th Cir.2002). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir.2001). *Accord Ningard v. Shin-Etsu Silicones of Am., Inc.*, 9th Dist. No. 24524, 2009-Ohio-3171, ¶ 17, quoting *Zechar v. Ohio Dept. of Edn.*, Ct. of Cl. No. 2001-01221, 2002-Ohio-6873, ¶ 11. ("other evidence is usually required, especially where the events are separated by more than a few days or weeks").

{¶20} Mangino's employment was terminated on October 7, 2009, two months after her last meeting with Human Resources regarding the inspection reports and approximately three months after first informing Human Resources about the hidden reports. Because of the gap in time between the alleged protected activity and Mangino's termination, Mangino could not rely solely on temporal proximity to satisfy the causation element. Instead, Mangino had to put forth some additional evidence.

1. Additional Evidence To Establish Causation

{¶21} Mangino argues that Western Reserve's reason for terminating her employment is pretextual, which is sufficient evidence to establish a genuine issue of material fact as to the

causation element. Western Reserve terminated Mangino for failing to meet specific performance goals. Mangino acknowledges that she was not meeting her performance goals, but argues that other underwriters were also not meeting the goals, and therefore, it may be inferred that she was fired because of the inspection reports. Mangino argues the circumstances show she was treated differently than other underwriters. After reviewing the record, we conclude Mangino's argument is without merit.

{¶22} Western Reserve had reason to treat Mangino differently than other underwriters. While there is evidence that other underwriters were not meeting the five day turn-around goal, Mangino's processing time was the worst among the underwriters. Although Mangino's monthly average processing numbers were not drastically behind other underwriters, she admitted that her supervisors expressed concern about how much she relied on the assistance of other underwriters to help manage her work.

> QUESTION: Kay[e] Risner talked to you about your doing more of your own work, didn't she?
>
> [MANGINO]: Yes.
>
> QUESTION: And she didn't want you to be relying so much on Tina Cabahug, [another underwriter]?
>
> [MANGINO]: That's right.

{¶23} In addition to the five day deadline for new applications, Mangino failed to meet deadlines for renewal reports.

> QUESTION: And you never got to a point where those [renewals] were consistently being done in a timely manner, did you?
>
> [MANGINO]: No.

Mangino presented no evidence that other underwriters also failed to process renewal reports timely. Further, Mangino testified that she "misspoke" to Campbell during one of her weekly

meetings, when she told her that all but two of her renewal reports were complete. In actuality, 13 renewal reports remained unfinished. Campbell testified that after that meeting, she no longer believed Mangino was credible. Western Reserve's decision to terminate Mangino and not other underwriters does not support the inference of discrimination.

{¶24} Even reviewing the facts in a light most favorable to Mangino, we conclude that Mangino has failed to produce any evidence supporting the conclusion that her termination was related to the inspection reports. Because Mangino has failed to show a genuine issue of material fact as to the causation element, the court did not err in granting Western Reserve's motion for summary judgment. *See Healey*, 2012-Ohio-2170, at ¶ 21. Mangino's second assignment of error is overruled.

### Assignment of Error Number One

THE TRIAL COURT ERRED WHEN IT FAILED TO APPLY THE 3-PRONG TEST WHEN ANALYZING WHETHER THE CIRCUMSTANCES SURROUNDING MANGINO'S TERMINATION SATISFIED THE "JEOPARDY" ELEMENT OF A CLAIM FOR WRONGFUL TERMINATION BASED ON PUBLIC POLICY.

{¶25} Because we conclude that Mangino has not shown a question of material fact as to the causation element, her first assignment of error is moot and we decline to address it. App.R. 12(A)(1)(c).

### III

{¶26} Mangino's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

MOORE, J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

KAMI D. BRAUER, Attorney at Law, for Appellant.

DANIEL W. SRSIC, Attorney at Law, and DAVID L. JARRETT, Attorney at Law, for Appellee.