OPINION
{¶ 1} Plaintiff-appellant, Geoffrey C. Mitchell ("Mitchell"), appeals from the decision of the Franklin County Court of Common Pleas granting defendants-appellees' motions for summary judgment. For the following reasons, we affirm.
 {¶ 2} Mitchell is an emergency physician licensed to practice medicine in the state of Ohio. Mid-Ohio Emergency Services, L.L.C. ("Mid-Ohio") employed Mitchell for the three months prior to his termination, September 1, 1998 through November 30, 1998. Prior to Mid-Ohio, Olentangy Emergency Physicians ("OEP") employed Mitchell. OEP operated the emergency department at Riverside Methodist Hospital ("ED") until August 31, 1998.[1] RMH entered into an exclusive contract with Mid-Ohio for the provision of medical services at ED. Under the contract, only a physician employed by Mid-Ohio could perform services in the ED. As part of Mid-Ohio's operating agreement, ownership of Mid-Ohio was divided 50% to InPhyNet and 50% among the member physicians.
 {¶ 3} Mid-Ohio selected Dr. John Drstvensek to serve as its medical director over both the Grant and RMH campuses. Dr. Drstvensek maintains the same interest in Mid-Ohio as the other member physicians. Dr. Gregory Decker is President of Mid-Ohio. Mitchell was hired by Mid-Ohio as a part-time emergency physician. Mitchell received his paycheck from Mid-Ohio and Mid-Ohio scheduled his shifts at ED. Mitchell was given the additional title of Medical Education Coordinator ("MEC").[2] At that time, Mitchell signed a contract with Dr. Decker to become a part-time employee as well as serve as Mid-Ohio's MEC for an additional salary of $20,000. As MEC, Mitchell reported to Pam Boyers, Ph.D., Director of Medical Education at RMH.
 {¶ 4} In 1998, Grant/RMH implemented the stable admit policy to reduce overcrowding in the RMH ED. The protocol required stable patients being admitted to the hospital to be moved to regular hospital beds to free up ED beds and ED examination rooms. Mitchell opposed the policy stating it conflicted with the teaching nature of RMH because the resident physician would not have the chance to see and examine the patient in the ED with the guidance of the ED physician.
 {¶ 5} The situation at Grant/RMH came to a head on November 9, 1998. A patient came to the RMH ED with chest pains and was initially assessed as being low risk for cardiac arrest. The patient was put in a bed in the hallway. However, while the patient was waiting, she collapsed and suffered cardiac arrest. Dr. Ron Taylor was the ED physician on duty at the time of the incident and Mitchell spoke with him about it the following day. Although the patient ultimately lived, Mitchell decided to write a letter to Dr. Richard Shonk, Vice President of Medical Affairs for RMH ("Shonk letter"), regarding the incident. The letter indicates it is a Clinical Process Improvement Team ("CPIT") referral. It further states:
Dear Dr. Shonk:
I believe you are the appropriate individual to review this case. I understand that you are the ultimate agent of quality medical care and chair of the hospital wide CPIT committee.
Mrs. XXXXX is another unfortunate victim of the gross overcrowding of our department. It is my contention that this is a significant quality of care issue.
Mrs. XXXXX presented to our ED in the early afternoon. Because the ED was in its usual * overcrowded state, she was triaged to a hallway bed. It (sic) spite of the fact that she had complained of chest pain, no EKG was done because she was in the hallway. It was not until she dropped dead (V-Fib = "cardiac sudden death") that she was moved into a room. There she was vigorously resuscitated by 4 or 5 physicians * * *.
* * * Any good physician knows that it is a good idea to obtain an EKG on a middle-aged patient with chest pain. We already have written chest pain policies which stipulate that a physician should have had Mrs. XXXXX's EKG in his hand within 5 minutes of her arrival. Unfortunately this protocol didn't do her any good.
* * *
Believe me, I am well aware that bad things happen in the ED. I have spent 17 years there. I do understand I think I also understand the role of QA/QRM/CQI/TQM etc. I believe your goal should be to prevent unnecessary deaths. This is the ultimate function of any QA committee, whatever its new name. This sort of review activity has a long and honorable role in American medicine. For generations it was called MM. It has been repeatedly emphasized that modern QA committees want to address "systems" issues. The perpetuance of "hallway medicine" in the RMH ED is a "systems" monster of the highest order. * * *
I realize I'm not making friends by lobbying to spend more money in the current environment. I'm all in favor of saving money and improving medical care. As you know, I have invested thousands of hours of my own time to develop workable ways to do so. I am also aware that we are spending $150 million to purchase two more hospitals. I suspect that these two hospitals are fraught with problems or they would not be for sale. The assumption of a huge debt burden and the responsibility of reforming problematic hospitals virtually guarantee that the quality of care in our ED will decline further. Until we expand our facility and eliminate the practice of "hallway medicine" this nightmare in the ED is destined to continue.
* * *
 {¶ 6} Dr. Shonk was a member of RMH's CPIT, a quality assurance committee. Mitchell also gave a copy of the Shonk letter to the following: (1) Dr. Taylor, the ED physician on duty at the time of the incident; (2) Dr. Larry Lilly, a member of the board of trustees; and (3) Dr. Steve Yakubov, cardiologist and chair of the department of internal medicine. Dr. Shonk gave the letter to Suzanne DeWoody, a member of the CPIT, for investigation. Ms. DeWoody is also the Vice-President of Grant/RMH and primary administrator of the ED. Ms. DeWoody determined that the Shonk letter primarily dealt with the size of the ED and did not address quality assurance issues. Therefore, Ms. DeWoody did not turn the Shonk letter over the CPIT committee for further review. A few days later, Mitchell wrote a second letter to Dr. Yakubov ("Yakubov letter"). This letter addressed concerns about procedures for evaluation of patients with chest pain in the ED. He distributed the Yakubov letter to Dr. Drstvensek, Dr. Lee Davis, Dr. Decker, Dr. Mike Hindeman, and nurse Lee Underman.
 {¶ 7} On November 18, 1998, a few days after the two letters were written, Mid-Ohio held its scheduled board meeting. The Shonk and Yakubov letters were distributed to all present. Dr. Decker testified that he had concerns with the Shonk letter. He stated that it could expose Mid-Ohio to liability for violating patient confidentiality because Mitchell used patient identifying information and dispersed it to individuals outside the quality assurance chain, namely Dr. Taylor, Dr. Lilly, and Dr. Yakubov. At the end of the board meeting, the board unanimously voted to terminate Mitchell's position as the MEC. The board reserved its decision as to whether Mitchell's employment as a physician was terminated until the next board meeting. However, on November 30, 1998, the board decided to terminate Mitchell. During the seven years Mitchell provided services at RMH, he expressed his opinions regarding issues in the ED on several occasions without being subjected to any adverse employment action.[3]
 {¶ 8} Mitchell filed a complaint against Mid-Ohio, InPhyNet, Acute Care Specialists, Inc., Dr. Drstvensek, Grant/RMH, and Ms. DeWoody, alleging: (1) wrongful termination in violation of public policy as to his position of MEC as well as ED physician; (2) violation of due process for being terminated without a hearing; (3) tortious interference of contract; (4) civil conspiracy; (5) negligent retention; and (6) breach of contract. The trial court did find a clear public policy articulated in Ohio's peer review statutes in support of Mitchell's wrongful termination claim. However, the trial court found that Mitchell's own actions in violating patient confidentiality and the peer review process eliminated the jeopardy element. Therefore, the trial court granted summary judgment on all claims. Mitchell filed the instant appeal.
 {¶ 9} Mitchell asserts the following assignments of error:
[1.] The trial court erred in failing to recognize Dr. Mitchell's objections to unsafe emergency department procedures as a basis for wrongful termination and in granting summary judgment to appellees on his wrongful termination claim
[2.] The trial court erred in holding that "Equitable Maxims" preclude Dr. Mitchell from pursuing his wrongful termination claims and thus, in granting partial summary judgment on appellant's wrongful termination claim
[3.] The trial court erred in granting summary judgment to appellee grant/riverside methodist hospitals on appellant's due process claim
[4.] The trial court erred in granting summary judgment on appellant's summary judgment to grant/riverside methodist hospitals on appellant's breach of contract claim
[5.] The trial court erred in dismissing the sixth claim: conspiracy
[6.] The trial court erred in granting summary judgment to the individual appellees susan dewoody and john drstvensek
[7.] The trial court erred in granting summary judgment on the issue of grant/riverside methodist hospital's (sic) status as plaintiff's employer for purposes of the meded coordinator position
[8.] The trial court erred in holding that Dr. Mitchell's Fourth claim for tortious interference was precluded by his "at-will" employment and thus in granting summary judgment to defendants susan dewoody, john drstvensek, inphynet hospital services, inc., and grant/riverside methodist hospital[s] on that claim
 {¶ 10} Mid-Ohio, Dr. Drstvensek, InPhyNet, and Acute Care also filed a cross-appeal asserting the following error:
1. The trial court erred in determining that appellant satisfied the "clarity" element of his claim for wrongful discharge in violation of public policy.
 {¶ 11} Grant/RMH and Ms. DeWoody have also filed a cross-appeal asserting the following assignment of error:
1. The trial court erred in finding Mitchell's claim for wrongful discharge in violation of public policy to have satisfied the "clarity" element of a public policy wrongful discharge claim.
 {¶ 12} Appellate review of summary judgment motions is de novo. Helton v. Scioto Cty. Bd. Of Commrs. (1997),123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court."Mergenthal v. Star Banc Corp. (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates the following: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. State exrel. Grady v. State Emp. Relations Bd. (1997),78 Ohio St.3d 181, 183. In the summary judgment context, a "material" fact is one that might affect the outcome of the suit under the applicable substantive law. Turner v. Turner (1993),67 Ohio St.3d 337, 340. When determining what is a "genuine issue," the court decides if the evidence presents a sufficient disagreement between the parties' positions. Id.
 {¶ 13} In Dresher, the Supreme Court of Ohio held that a party seeking summary judgment on the ground that the nonmoving party cannot prove its case bears the initial burden to inform the trial court of the basis for the motion and identifying the portions of the record demonstrating an absence of a genuine issue of material fact. Dresher v. Burt (1996),75 Ohio St.3d 280. The moving party does not discharge its burden simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Id. Rather, the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) that affirmatively demonstrates the nonmoving party has no evidence to support its claims. Id. Further, when a motion for summary judgment has been supported by proper evidence, the nonmoving party may not rest on the mere allegations of the pleading, but must set forth specific facts, by affidavit or otherwise, demonstrating that there is a genuine triable issue.Jackson v. Alert Fire Safety Equip., Inc. (1991),58 Ohio St.3d 48, 52. If the nonmoving party does not demonstrate a genuine triable issue, summary judgment shall be entered against that party. Civ.R. 56(E).
 {¶ 14} In the first assignment of error, Mitchell argues the trial court erred in its determination of his wrongful termination claim against all appellees. In the second assignment of error, Mitchell asserts the trial court erred in finding that Mitchell's own conduct precluded him from recovering on the wrongful termination claim. These two assignments of error are interrelated and will be discussed together.
 {¶ 15} Generally, absent an employment contract, the employer/employee relationship is considered at-will. Greely v.Miami Valley Maintenance Contrs., Inc. (1990),49 Ohio St.3d 228. Thus, the employer may terminate the employee for any lawful reason and the employee may leave the relationship for any reason. Id. There are exceptions to the general rule. InGreely, the Supreme Court of Ohio held an exception to the traditional at-will employment rule exists where an employee is terminated wrongfully in violation of public policy. Id. at 235. Public policy is generally discerned from the United States and Ohio Constitutions, statutes, administrative rules and regulations, and common law. Painter v. Graley (1994),70 Ohio St.3d 377, 384. However, the public policy must be "of equally serious import as the violation of a statute." Id. at 384.
 {¶ 16} To state a claim of wrongful termination in violation of public policy, a plaintiff must satisfy the following elements: (1) a clear public policy existed and was manifested in the federal or state constitution, statute, administrative regulation, or common law; (2) terminating employees under circumstances such as those involved in the plaintiff's termination would jeopardize the public policy; (3) plaintiff's dismissal was motivated by conduct related to the public policy; and (4) the employer lacked overriding legitimate business justification for the dismissal. Collins v. Rizkana (1995),73 Ohio St.3d 65, 69-70. The first two prongs are questions of law for the court while the latter two prongs are questions for the trier of fact. Id.
 {¶ 17} For example, in Kulch, the plaintiff was discharged after filing complaints with the Occupational Safety and Health Administration ("OSHA"). Kulch v. Structural Fibers, Inc.
(1997), 78 Ohio St.3d 134. The plaintiff brought a claim for wrongful discharge in violation of public policy. The court recognized the numerous statutes and constitutional provisions that support workplace safety, in keeping with the important objectives of OSHA. Id. The court held that retaliation against employees who filed complaints relating to workplace safety clearly contravened the public policy of Ohio. Id. Similarly, inCollins, supra, a discharged employee could maintain a wrongful termination claim based on sexual harassment and discrimination. The clear public policy against sexual harassment was expressed in statutory law and the statute's remedies were not available to the employee because her employer did not employ four or more persons. Anders v. Specialty Chem. Resources, Inc. (1997),121 Ohio App.3d 348 (stating claim for violation of public policy in terminating employee for refusing to engage in insurance fraud);Trader v. People Working Cooperatively, Inc. (1994),104 Ohio App.3d 690, app. dism. (1996), 74 Ohio St.3d 1286 (stating claim where employee was terminated for reporting illegal drug use). Accordingly, the first issue we address is whether a clear
public policy exists to support Mitchell's claim.
 {¶ 18} Mitchell argues that R.C. 2305.24, R.C. 2305.251, and R.C. 2305.252 reflect the important public policy of encouraging physicians to report substandard patient care issues without retaliation to a quality assurance committee or a member thereof, and as such, protects Mitchell's actions in this case. R.C.2305.24 provides in part:
Any information, data, reports, or records made available to a quality assurance committee or utilization committee of a hospital * * * are confidential and shall be used by the committee and the committee members only in the exercise of the proper functions of the committee. * * * A right of action similar to that a patient may have against an attending physician for misuse of information, data, reports, or records arising out of the physician-patient relationship shall accrue against a member of a quality assurance committee or utilization committee for misuse of any information, data, reports, or records furnished to the committee by an attending physician. No physician, * * * shall, by reason of the furnishing, be deemed liable in damages to any person, or be held to answer for betrayal of a professional confidence * * *. Information, data, or reports furnished to a utilization committee of a state or local medical society shall contain no name of any person involved therein.
* * *
 {¶ 19} R.C. 2305.251 provides immunity to health care entities for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee. R.C. 2305.252 provides for confidentiality of peer review committee proceedings and records. There is no question that R.C.2305.24 protects physicians from personal liability if he or she provides information to a quality assurance committee in accordance with the statute. However, the case at bar is not so simple. Mitchell is asking us to find a clear public policy that employers cannot discharge employees who complain about patient care outside the quality assurance chain. We decline to extend the narrow public policy exception to the employment at-will doctrine this far.
 {¶ 20} Mitchell stated that the Shonk letter and the Yakubov letter were quality assurance documents. Appellees argue the Shonk and/or Yakubov letters were never a part of the quality assurance process. Whether or not the letters were quality assurance documents is of no relevance to resolving the question as to whether Mitchell's actions are protected by public policy.
 {¶ 21} We have a situation where the physician, Mitchell, distributed the letters to a number of different individuals. Several of those individuals were not members of the quality assurance committee. To afford protection to Mitchell's actions would destroy the entire purpose behind the creation and protection of quality assurance committees and proceedings. Any physician could document a complaint about an issue, call it a quality assurance document, distribute it to whomever he or she pleased, and be protected from termination even though the physician may have breached patient confidentiality, exposed the health care entity to potential liability, or violated hospital policy. Therefore, we find there is no clear public policy evidenced in the above-mentioned statutes or case law to protect Mitchell in this case.
 {¶ 22} To the extent Mitchell suggests an even broader public policy by arguing that anyone who complains about patient care to anyone is protected from discharge, we cannot extend the exception this far. While the cases cited by Mitchell note the importance of patient care, they do not clearly define a public policy that would be applicable to this case. If Mitchell's argument were accepted, any physician or health care worker who complained to anyone about patient care issues at any time during their employment who is later discharged, could file an action for wrongful termination in violation of public policy. Ohio law does not support such a sweeping interpretation of the public policy exception to employment at-will. If we were to hold otherwise, Ohio's long-standing and predominate rule that employees are terminable at-will would disappear.
 {¶ 23} Further, Mitchell's argument that his opposition to the stable admit policy should be protected under this doctrine is without merit. Greeley, supra; Collins, supra. For the reasons stated above, Ohio law does not extend the public policy exception to protect Mitchell from discharge. Greeley, supra;Collins, supra. We are simply not willing to extend public policy this far.[4] Accordingly, Mitchell's first and second assignments of error are overruled and summary judgment is appropriate on Mitchell's wrongful termination in violation of public policy claim against appellees.[5] Mid-Ohio's and Grant/RMH's cross-assignment of error are also sustained.
 {¶ 24} In the third assignment of error, the trial court erred in granting summary judgment to appellee Grant/RMH on Mitchell's due process claim. Mitchell argues that upon being terminated from Mid-Ohio, he was entitled to a due process hearing based on Grant/RMH's by-laws. Mitchell relies on provision 12.1(a) of the by-laws:
Except as otherwise provided for herein, any Practitioner whose appointment or reappointment to the Medical staff or advancement in Medical staff membership has been denied or any Practitionerwhose Clinical Privileges have been curtailed, suspended, revokedor denied, or any Practitioner who has received any adverse recommendation from the Medical Executive Committee, Medical Staff or Governing Body, relative to a matter of Medical Staff appointment or Clinical Privileges ("adverse action") will have the right to a formal hearing by a panel of individuals or a hearing officer appointed by the Governing Body, or its designee.
* * *
(Emphasis added.)
 {¶ 25} We agree with the trial court that Mitchell's due process claim against Grant/RMH fails for the reason that it never took any action against Mitchell. Grant/RMH did not curtail, suspend, revoke, or deny Mitchell any privileges at the hospital. The letter of termination from Mid-Ohio sufficiently illustrates this fact. It states: "[y]our employment as an emergency department physician at Grant/[RMH] shall continue until you are otherwise notified." Grant/RMH simply did not take adverse action against Mitchell. Holt v. Good Samaritan Hosp.and Health Ctr. (1990), 69 Ohio App.3d 439; Collins v.Associated Pathologists, Ltd. (C.A.7, 1988), 844 F.2d 473;Plummer v. Community Gen. Hosp. of Thomasville, Inc. (2002),155 N.C.App. 574 (the right to exercise medical privileges is separate and distinct from the granting or revoking of those privileges and a physician is not guaranteed employment to exercise those privileges). The Collins court succinctly stated:
Dr. Collins also asserts that St. John's [Hospital] wrongfully removed or reduced his staff privileges in violation of the bylaws of the hospital. However, the record reflects that St. Johns has neither removed nor reduced Dr. Collins' staff privileges. * * * Staff privileges reflect the hospital's decision that a physician is qualified to practice in the facility, but do not in and of themselves confer employment. Employment as a pathologist at St. John's was determined by the legal contract between St. John's and APL [the exclusive contractor]. * * * Although without concurrent employment by St. John's as a pathologist these staff privileges may be of littleor no value to Dr. Collins, the fact remains that the privileges were neither removed nor reduced. * * *
Collins, supra, at 481. (Citation omitted; emphasis added.)
The fact that Grant/RMH did not curtail, suspend, or revoke Mitchell's privileges defeats his due process claim based on the by-laws as well as a common law due process claim. Accordingly, Mitchell's third assignment of error is overruled.
 {¶ 26} In the fourth assignment of error, Mitchell claims the trial court erred in granting summary judgment to Grant/RMH on appellant's breach of contract claim. Mitchell argues Grant/RMH breached its contract with him by denying him due process upon his termination from Mid-Ohio. He maintains that Grant/RMH promised that if he was denied the opportunity to practice, he would have access to a grievance process to determine if the denial was justified.
 {¶ 27} In Munoz, the court discussed whether hospital by-laws contractually bind the hospital. Munoz v. Flower Hosp.
(1985), 30 Ohio App.3d 162. The court mentioned cases that hold a hospital is bound by the by-laws otherwise the by-laws are meaningless, while other cases find the hospital is not bound because there is no consideration or mutuality of obligation between the parties. Id. (Citations omitted.) The court concluded the "most enlightened reasoning seems to be that staff bylaws can form a binding contract between the doctors and hospital but only where there can be found in the bylaws an intent by both parties to be bound." Id. at 166; Wolf v. McCullough-Hyde Mem. Hosp.,Inc. (1990), 67 Ohio App.3d 349.
 {¶ 28} However, we do not resolve the issue of whether the parties intended to be bound by the by-laws. Mitchell maintains his staff privileges at Grant/RMH. As with Mitchell's due process claim, his breach of contract claim against Grant/RMH fails because Grant/RMH has not taken any adverse action against him. It has not curtailed, suspended, denied, or revoked his privileges. The hospital is under no obligation by virtue of the by-laws to insure that Mitchell is provided work at the hospital.Khosla v. Magruder Mem. Hosp. (June 30, 1993), Ottawa App. No. 92OT053 (whether or not hospital by-laws constitute a contract is a non-issue where the plaintiff anesthesiologist retained staff privileges at the hospital. "The hospital has no obligation under the bylaws to insure that [plaintiff doctor] is provided work at the hospital.") Thus, Mitchell's breach of contract claim fails. Accordingly, the fourth assignment of error is overruled.
 {¶ 29} We now turn to Mitchell's eighth assignment of error. Mitchell claims the trial court erred in finding that his employment at-will status precluded recovery for tortious interference with contract. Mitchell asserts this claim against Mid-Ohio, InPhyNet, Acute Care, and Dr. Drstvensek. To prevail on a claim of tortious interference with contract, Mitchell must show: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification for the interference; and (5) resulting damages. Fred SiegelCo., L.P.A. v. Arter Hadden (1999), 85 Ohio St.3d 171, paragraph 1, syllabus. "Tortious interference with contract requires an actor to improperly interfere with the performance of a contract between two other persons." Emergency Preemption,Inc. v. Emergency Preemption Sys., Inc. (Aug. 14, 1997), Cuyahoga App. No. 71350. The trial court held there could be no interference with contractual relations if the contract is terminable at-will. We agree. If an employee is at-will, tortious interference with contract is not a viable cause of action.Emergency Preemption, Inc., supra; Hoyt, Inc. v. Gordon Assocs., Inc. (1995), 104 Ohio App.3d 598. In this case, Mitchell was an at-will employee. Therefore, his claim for tortious interference with contract must fail.
 {¶ 30} Mitchell argues on appeal that he alleged tortious interference with employment relations in addition to or instead of tortious interference with contract. Ohio law recognizes both torts as independent of one another. Dryden v. Cincinnati BellTel. Co. (1999), 135 Ohio App.3d 394. "Tortious interference with contractual or business relations does not require a showing of malice, and is largely an adaptation of the Restatement of the Law * * *." Dryden, supra, at 400. On the other hand, the tort of wrongful interference with employment relations requires a showing of "either wanton or malicious behavior" when the tort is asserted against an "outsider," meaning an individual not worthy of a qualified privilege. Id., citing Contadino v. Tilow
(1990), 68 Ohio App.3d 463, 467. Both torts recognize the applicability of a qualified privilege. Smith v. Ameriflora1992, Inc. (1994), 96 Ohio App.3d 179, 187; EmergencyPreemption, Inc., supra. In order to overcome the defense of qualified privilege the claimant must demonstrate that the interferer(s) acted with actual malice. Ameriflora,
supra.[6]
 {¶ 31} With respect to tortious interference with employment relations, "[t]he general rule in Ohio is that an employee earning a living has a right to pursue such employment free from unwarranted interference by third persons * * *. Moreover, it has been held that this right of noninterference extends even to an at-will employee." Contadino, supra, at 467. However, the right of noninterference is limited by the applicability of a qualified privilege. Id. For example, a person in a supervisory capacity or other position of authority over the employee cannot be held liable for interfering if it is that person's duty to monitor, supervise, or enforce. Id. (Holding that director of crisis intervention did not maliciously interfere with employment even though director advocated employee's dismissal where director owed a duty to the program to advocate the dismissal if it was in the program's best interest); Emergency Preemption, supra (a corporate officer cannot interfere with contract in the capacity as corporate officer if the officer or person is legitimately asserting a legally protected interest); Smiddy v. Kinko's,Inc., Hamilton App. No. C-020222, 2003-Ohio-446; Hall v. UnitedLabs, Inc. (N.D.Ohio 1998), 31 F.Supp.2d 1039 (doctor and laboratory hired by the employer to analyze employee drug tests were privileged to intervene in employment relationship and not liable for tortious interference).
 {¶ 32} Mitchell titled the pertinent cause of action tortious interference with contract and alleged the following: "Defendants Grant/[RMH], DeWoody, Shonk and/or IMMI tortiously interfered with Plaintiff's agreement with Mid-Ohio, causing Mid-Ohio to sever its relationship with him, and to breach its agreement to convey upon Plaintiff and (sic) ownership interest." (Dec. 27, 2000, Amended Complaint, at ¶ 33.) We find these allegations insufficient to state a claim for tortious interference with employment relations. As stated above, this tort requires a showing of malicious interference or wanton behavior. Robinsonv. Springfield Local School Dist. Bd. of Edn., Summit App. No. 20606, 2002-Ohio-1382 (an employee's interference may be justified and not actionable when it comes within the scope of one's duties and is not malicious); Contandino, supra. Accordingly, Mitchell's claim for tortious interference with contractual or business relations and/or tortious interference with employment relations fails. The eighth assignment of error is overruled.
 {¶ 33} In the fifth assignment of error, Mitchell contends the trial court erred in granting summary judgment on his civil conspiracy claim. To state a claim for civil conspiracy, Mitchell must establish four elements. Those elements include: (1) a malicious combination; (2) of two or more persons; (3) resulting in injury to person or property; and (4) the existence of an unlawful act independent of the actual conspiracy. Davidson v.BP Am., Inc. (1997), 125 Ohio App.3d 643. A civil action for conspiracy cannot be maintained unless something is done which without the conspiracy, would give rise to a cause of action.Khosla, supra, quoting Minarik v. Nagy (1963),8 Ohio App.2d 194,195. In other words, there must be a viable claim distinct from the conspiracy in order for the conspiracy claim to survive. In this case, there are no surviving claims. Therefore, Mitchell's fifth assignment of error is overruled.
 {¶ 34} In the sixth assignment of error, Mitchell claims the trial court erred in granting summary judgment to Ms. DeWoody and Dr. Drstvensek.
For all of the reasons stated above, Mitchell asserts no viable claims. Accordingly, Mitchell's sixth assignment of error is overruled.
 {¶ 35} In the seventh assignment of error, Mitchell argues the trial court erred in granting summary judgment on the issue of Grant/RMH's status as plaintiff's employer for purposes of the MEC position. Because Mitchell was not employed by Grant/RMH, he cannot succeed on any of his claims against any appellees, and it is unnecessary to address this issue. Accordingly, Mitchell's seventh assignment of error is overruled.
 {¶ 36} Based on the foregoing, the trial court properly granted summary judgment to Mid-Ohio, InPhyNet, Acute Care, Grant/RMH, Ms. DeWoody, and Dr. Drstvensek. There is no clear public policy to protect Mitchell from discharge in this case. Mitchell destroyed the purpose of the statutes he seeks to use as a shield by deciding to take it upon himself to disperse the so-called quality assurance letters to individuals outside the quality assurance chain.
 {¶ 37} Grant/RMH owed Mitchell no due process. Moreover, for the same reason, Grant/RMH did not breach its contract with Mitchell by virtue of any violation of the by-laws as it never sought to curtail, suspend, or revoke Mitchell's privileges. Mitchell's claim for tortious interference with contract fails since Mitchell was an employee at-will. Further, Mitchell did not sufficiently plead a claim for tortious interference with employment relations as he failed to plead malicious or wanton behavior. Mitchell's civil conspiracy claim fails because no underlying tort remains viable. Finally, we do not reach the issue of whether Grant/RMH was Mitchell's employer for purposes of the MEC position.
 {¶ 38} Based on the foregoing, Mitchell's first, second, third, fourth, fifth, sixth, seventh, and eighth assignments of error are overruled. The sole error on cross-appeal is sustained. Accordingly, the judgment of the trial court is affirmed.
Judgment affirmed.
Bryant and Klatt, JJ., concur.
[1] Riverside Methodist Hospital ("RMH") and Grant Hospital ("Grant") were merged into a single hospital in 1995. Riverside's emergency department was previously serviced by OEP. Acute Care serviced Grant Hospital's emergency department. After the merger, InPhyNet Medical Management, Inc. ("InPhyNet") assumed all the emergency duties. Mid-Ohio was eventually formed, in which InPhyNet became a shareholder and was responsible for the management of the new physician group.
[2] Mid-Ohio maintains it was hesitant to initially offer Mitchell any position because of his reputation as a disruptive force in the ED, did not work as a team player, and violated hospital policy by taking home patient charts for dictation.
[3] For example, a letter dated April 3, 1997, addressed the need for a larger ED so patients were not serviced in the hallways. Mitchell analogized the ED to the type of medicine practiced in third world countries. Mitchell wrote the letter to Dr. Bruce Wall, predecessor to Dr. Shonk.
[4] Mitchell also argues that his termination violated hisFirst Amendment protections under the Ohio and United States Constitutions. However, these constitutional provisions do not apply to private actors. Stephenson v. Yellow Freight Sys.,Inc. (Oct. 26, 1999), Franklin App. No. 99AP-77), discretionary appeal not allowed (2000), 88 Ohio St.3d 1432; Petrovski v. Fed.Express Corp. (N.D.Ohio 2002), 210 F.Supp.2d 943, 947 (holding plaintiff's wrongful discharge claim in violation of public policy based on freedom of speech is without merit "as the prohibitions contained therein apply only to state action, not the actions of a private citizen or employer." (Citation omitted.)
[5] To the extent Mitchell argues that his own conduct should not preclude recovery on his public policy claim based onPytlinski v. Brocar Products, Inc. (2002), 94 Ohio St.3d 77
and/or Himmel v. Ford Motor Co. (C.A.6, 2003), 342 F.3d 593, the argument is without merit. In Pytlinski, the Supreme Court of Ohio stated in a footnote that the specific requirements for filing a complaint set forth in a statute need not be met so long as the discharge is "related to the public policy." Id. at 80, fn. 3. The case at bar is completely distinguishable fromPytlinski. Here, the public policy identified in the statute would be defeated if complaints were not kept confidential. Similarly, in Himmel, the plaintiff reported his employer's illegal activities. The plaintiff necessarily engaged in some of those activities. The Sixth Circuit held the plaintiff's own conduct did not defeat his wrongful termination claim as plaintiff's conduct fell within the scope of the policy and was necessary to further the policy manifested in the labor laws.Himmel, supra. Again, in the case at bar, Mitchell's actionsdo not further the policy manifested in the peer review andquality assurance statutes. To the contrary, his actions defeat that policy by not following the procedures set forth in the statutes, namely distributing both letters to individuals outside the CPIT.
[6] We would point out that courts do not always distinguish between the two torts when an employee is terminated and is the plaintiff. However, if tortious interference with contract or business relations is not available because the employee is at-will and tortious interference with employment relations is available, the distinction must be recognized as the court did in the Dryden case. Further, we find the malice or wanton requirement necessary to ensure the employment at-will doctrine is not destroyed by employees who are discharged and later bring an action against an outsider who did something the employee did not like. Wilson v. Procter Gamble (Nov. 6, 1998), Hamilton App. No. C-970778, citing Anderson v. Minter (1972),32 Ohio St.2d 207 ("a cause of action may be recognized against an outsider for malicious interference, but the court cautioned that liability must be predicated on a finding of malicious conduct").