[Cite as *Buckeye Wellness Consultants, L.L.C. v. Hall*, 2022-Ohio-1602.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Buckeye Wellness Consultants, LLC, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 20AP-380 |
| v. | : | (C.P.C. No. 18CV-5238) |
| Orin Lamont Hall, M.D. et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on May 12, 2022

**On brief:** *Pencheff & Fraley, LPA, Joseph A. Fraley*, and *Joshua M. Fraley*, for appellant. **Argued:** *David Fraley*.

**On brief:** *Soroka & Associates, LLC, Roger Soroka*, and *Joshua Bedtelyon*, for appellees. **Argued:** *Joshua Bedtelyon*.

APPEAL from the Franklin County Court of Common Pleas

JAMISON, J.

**{¶ 1}** Plaintiff-appellant, Buckeye Wellness Consultants, LLC ("Buckeye Wellness"), appeals a judgment of the Franklin County Court of Common Pleas finding in favor of defendants-appellees, Orin Lamont Hall, M.D. ("Hall"), Gina Walker ("Walker"), and Robert Santiago, M.D. ("Santiago").  For the reasons below, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

**{¶ 2}**  Appellant, Buckeye Wellness, is a healthcare business established in 2014 to provide medical services to individuals with workers' compensation and personal injury claims.  Buckeye Wellness was formed by three individuals, Dr. Donald Weinstein, Attorney Benjamin Zacks, and Attorney Stephen Mindzak. All three operated behind a limited liability company and blind irrevocable trusts.

{¶ 3} Appellee Hall is a medical doctor practicing in workers' compensation and personal injury and is certified by the Ohio Bureau of Workers' Compensation ("BWC"). Hall entered into a physician employment agreement ("employment agreement") with Buckeye Wellness on August 29, 2014, which set the term of his employment contract at one year beginning October 1, 2014, and included a covenant not to compete and solicit within a 15-mile radius for a period of one year following Hall's termination. Hall worked at Buckeye Wellness 5 days a week and maintained an interest in a medical business in Texas during his time at Buckeye Wellness. Hall met with Buckeye Wellness management after his first year to discuss changing his contract. On February 16, 2016, Hall submitted a letter of resignation to Buckeye Wellness, but he continued to work until April 18, 2016 to allow for a smooth transition of patients.

{¶ 4} Appellee Santiago is a medical doctor practicing in workers' compensation and personal injury, and also has a certification from BWC. Santiago was the first physician hired by Buckeye Wellness, and previously practiced with Hall at Franklin Park Medical Center ("Franklin Park"). Santiago entered into a physician's services agreement ("services agreement") on December 1, 2013, which set the term of his employment contract at one year beginning January 1, 2014, and included a covenant not to compete and solicit within a five-mile radius for a period of one year following termination by Santiago. Santiago worked at Buckeye Wellness one day a week and maintained a separate private medical practice. At the conclusion of his first year, Santiago discussed modifying his employment contract with Buckeye Wellness. On March 2, 2016, Santiago submitted a letter of resignation to Buckeye Wellness, but continued to work until April 14, 2016.

{¶ 5} Appellee Walker was Buckeye Wellness' first employee and held the title of Assistant Director of Internal Operations. Walker served as the office manager and interfaced with attorneys, patients, and doctors. Walker served in the same position at Franklin Park prior to being hired by Buckeye Wellness. Walker did not sign an employment contract. On February 17, 2016, Walker submitted her letter of resignation, effective March 18, 2016.

{¶ 6} Santiago, Hall, and Walker each formed a limited liability company ("LLC"), and the doctors leased space from appellee Ajay Syam ("Syam"), a chiropractic physician, and started a new practice on South High Street. Hall, Santiago, and Buckeye Wellness

sent letters to patients informing them of the move. After a few months, Hall and Santiago moved to a different location on Morse Road, where they sublet from Syam. Walker initially provided administrative services for all three doctors when they were in the same building on South High Street but left to join Hall and Santiago in their new space. The Buckeye Wellness receptionist, Deneisha ("Dee"), while not a party to this matter, also resigned to work with appellees at their new location.

{¶ 7} Buckeye Wellness filed suit against Santiago, Hall, Walker, their new LLC, and Syam, alleging breach of contract, promissory estoppel, trade secret misappropriation, breach of the duty of loyalty, conversion, tortious interference with an existing and prospective business relationships, tortious interference with a contract, civil conspiracy, breach of fiduciary duties, failure to maintain or provide records, wrongful termination, unjust enrichment, and spoliation of evidence.

{¶ 8} The parties waived a jury trial and, after a bench trial, the trial court issued a decision granting judgment in favor of appellees and dismissing all appellant's claims. Appellant now brings this appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 9} Appellant assigns the following errors for our review:

> I. The Trial Court Erred in Finding that Appell[ees] Orin Hall and Roberto Santiago Contracts were non-renewable cont[r]acts which had expired after one year, despite the clear language in the cont[r]act and the intent of the parties which shows that the contract was a renewable contract.
>
> II. The Trial Court Committed Reversible Error in Finding that Hall and Santiago were not bound by the restrictive covenants in the signed contracts.
>
> III. The Trial Court Erred in Finding Appellees did not misappropriate trade secrets of Buckeye Wellness, which included client lists and referral sources.

## III. STANDARD OF REVIEW

{¶ 10} "Interpretation of contracts is a matter of law, and questions of law are subject to de novo review on appeal." *Fendley v. Wright State Univ.*, 10th Dist. No. 18AP-113, 2019-Ohio-1963, ¶ 13. Therefore, we must conduct "an independent analysis without

deference to the trial court's determination." *Washington v. Evans*, 10th Dist. No. 20AP-305, 2021-Ohio-587, ¶ 16.

## IV. LEGAL ANALYSIS

{¶ 11} Appellant asserts in the first assignment of error that the trial court erred in finding that Santiago's and Hall's contracts were non-renewable and expired after one year. We disagree.

{¶ 12} "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes a duty." *Phu Ta v. Chaudhry*, 10th Dist. No. 15AP-867, 2016-Ohio-4944, ¶ 10. " 'To successfully prosecute a breach of contract claim, a plaintiff must present evidence of (1) the existence of a contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract, and (4) plaintiff's loss or damage as a result of defendant's breach.' " *Id.*, quoting *Barlay v. Yoga's Drive-Thru*, 10th Dist. No. 03AP-545, 2003-Ohio-7164, ¶ 6.

{¶ 13} Interpretation of a written contract is a matter of law. *Guaranteed Constr. Servs. v. Grand Communities, Ltd.*, 10th Dist. No. 17AP-213, 2017-Ohio-9288, ¶ 22. "In construing the terms of any contract, the principal objective is to determine the intention of the parties." *Hamilton Ins. Servs. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987). When determining the parties' intent in the language of the contract, a reviewing court must read the contract as a whole and give effect, when possible, to every provision in the agreement. *Clark v. Humes*, 10th Dist. No. 06AP-1202, 2008-Ohio-640, ¶ 12.

{¶ 14} When the terms in an existing contract are clear and unambiguous, we cannot create a new contract "by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241, 246 (1978). A contract is ambiguous where it cannot be given a "definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, ¶ 11. "Only when a definitive meaning proves elusive should rules for construing ambiguous language be employed. Otherwise, allegations of ambiguity become self-fulfilling." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, ¶ 11. "If the meaning is apparent, the terms of the agreement are to be

applied, not interpreted." *Albert v. Shiells*, 10th Dist. No. 02AP-354, 2002-Ohio-7021, ¶ 20, citing *Carroll Weir Funeral Home v. Miller*, 2 Ohio St.2d 189, 192 (1965).

{¶ 15} It is not disputed that both Hall and Santiago signed employment contracts with Buckeye Wellness. The term of the contracts, however, is hotly disputed. Appellants assert that the contracts are both renewable contracts, while appellees believe the trial court was correct and that the contracts were for a one-year term and not capable of being renewed.

{¶ 16} Santiago's services agreement has an effective date of January 1, 2014, and was for a one-year term. The agreement contains the following language:

> 3.    TERM.    The effective date of hire for the services of Medical Doctor/Physician by Company shall be 01/01/14 (the "Effective Date"). The term of this Agreement shall commence on the Effective Date of this Agreement and shall continue for one (1) year(s) thereafter (the "Term"). Medical Doctor/Physician's compensation shall be reviewed at the end of each contract year of this Agreement. Except as otherwise provided herein, upon the execution of this Agreement, any and all prior contracts by and between Company and Medical Doctor/Physician shall be null and void.

(Ex. B, Jun. 20, 2018 Compl.) Within the context of Santiago's services agreement, the statement that the term shall continue for one year thereafter is not ambiguous and should be assigned its normal meaning. There is no provision for renewal. Although appellant refers to the parties' intent that the contract was to continue each year thereafter, any attempt to offer any interpretation of the contract through parole evidence must fail because "the language of the agreement is plain and unambiguous." *Yoder v. Columbus & S. Ohio Electric Co.*, 39 Ohio App.2d 113 (10th Dist.1974). Applying the language of the contract to its plain meaning, we find that Dr. Santiago's services agreement expired January 1, 2015, and did not renew.

{¶ 17} Hall's employment agreement contains similar language to Santiago's regarding the term.

> 3.    TERM.    The effective date of employment of Employee by Employer shall be October 1, 2015 (the "Effective Date"). The term of this Agreement shall commence on the Effective Date of this Agreement and shall continue for one (1) year(s) thereafter (the "Term"). Employee's salary shall be

reviewed at the end of each contract year of this Agreement. Except as otherwise provided herein, upon the execution of this Agreement, any and all prior contracts by and between Employer and Employee shall be null and void.

(Ex. A, Jun. 20, 2018 Compl.) The agreement states that the term is for one year and does not contain any renewal provisions.[1] The plain language of Hall's contract provides that it expired on October 1, 2015 and does not renew.

{¶ 18} Appellant relies upon a few references to renewal interspersed in the contract as the basis for a renewable term. However, such generic references provide no support to make the contract renewable. Had the parties intended the contract to be renewable, then the term would reflect the number of years the contract renews. In the instant case, the term is set at one year, a common term that is clear and unambiguous. The language that the doctors' compensation will be reviewed at the end of each contract year relates back to the one-year term of the agreement and nothing more can be read into the statement. There is no path to a multi-year renewable term.

{¶ 19} Hall and Santiago clearly view the term of their respective agreements as one year, and deny the agreements were automatically renewed for additional one-year terms. Attorney Zacks, appellant's founder, counsel, as well as a drafter of the employment agreements, believed that the contracts automatically renewed. When asked to explain the basis for the automatic renewal, Zacks testified:

> [ZACKS]: Term: Paragraph 3. The effective date of the employment shall be October 1 -- 2014 is the correct date. It says 2015. And the term shall commence on the effective date of this agreement and continue for one year thereafter. Employee's salary shall be reviewed at the end of each contract year of this agreement. So the contract shall continue for one year thereafter. That says to me that it automatically continues.
>
> [COUNSEL]: So you're saying that it renews every year as a result of that specific claim right there?
>
> [ZACKS]: I am. And the reason I am doing that is because in the context of the negotiation, we wanted to make certain that

---

[1] The actual effective date in the agreement is October 1, 2015, but the parties stipulate to the correct date of October 1, 2014.

it would automatically renew. That was to both parties' advantage. It was nothing for anybody to do. And you would only have an affirmative duty to change that if you were going to be trying to terminate it.

(Feb. 24, 2020 Tr. Vol. I at 86-87.) However, the contract does not state that it renews automatically and does not contain any guidance regarding renewal. Had Buckeye Wellness wanted to clarify the duration of the employment agreements, it could have used language that clearly defines it.

{¶ 20} The trial court was correct in determining that the phrase "shall continue for one (1) year(s) thereafter" means the contract has a term of one year. The use of the term "year(s)" does not operate to make the agreement a renewable contract. The inclusion of the parenthetical plural after the word year—(s)—indicates that the term can be singular or plural. When the contract drafters inserted the number one, then the term is a single, non-renewable year. Had the drafters inserted the number five, then the term would be five years. The term is unambiguous whether it is one year or five years. That is the only meaning available under the circumstances. A court should give a common word its ordinary meaning, "unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents" of the contract. *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, ¶ 38, quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus. Therefore, there was no error when the trial court applied the clear and unambiguous terms of the employment agreements to the parties and determined the employment contracts had lapsed at the time Hall and Santiago resigned from Buckeye Wellness.

{¶ 21} Since the agreements are for one-year, non-renewable terms, we must next address the status of the employment relationship after the agreement expired. The question faced by the trial court was a determination of the terms of the doctors' continued employment with Buckeye Wellness.

{¶ 22} The general rule of contracts under such a situation was " '[w]here a contract of employment for a definite time is made and the employee's services are continued after the expiration of the time, without objection, the inference is that the parties have assented to another contract for a term of the same length with the same salary and conditions of

service, following the analogy of a similar rule in regard to leases.' " *Meek v. Solze*, 6th Dist. No. OT-05-055, 2006-Ohio-6633, ¶ 20, quoting 1 Williston, *Contracts*, Sec. 90 (Rev. Ed.). *See also Kelly v. Carthage Wheel Co.*, 62 Ohio St. 598 (1900). The employee who continues working under the same terms and conditions after the employment agreement has expired becomes a hold-over employee. *Ojalvo v. Bd. of Trustees*, 10th Dist. No. 88AP-773, 1989 Ohio App. LEXIS 3548 (Sept. 14, 1989).

{¶ 23} However, the presumption that arises from an employee's continued employment is "rebuttable by proof that a new contract for the continued period has been entered into, or by facts and circumstances showing that the parties did not intend to continue upon the terms and conditions of the original contract." *Id.* at *11, quoting Annotation, 53 A.L.R.2d 394 (1957). We review the parties' actions to determine intent to continue employment under the original employment agreements.

{¶ 24} Hall met with Buckeye Wellness management at the end of his first year at the practice and discussed changing his employment agreement. Hall wanted to be an owner and did not want to continue the employment relationship on the same terms and conditions. Hall also had issues with working conditions and compensation. Zacks testimony confirms the parties were in the process of changing the terms and conditions of the original contract:

> [ZACKS]: There was no direct offer made to Dr. Hall. They were general conversations consistent with the conversations we had during the course of negotiating his employment agreement.
>
> [COUNSEL]: Was there ever any sort of promise or even a proposal as to how he might go about eventually procuring that position as a member of ownership in Buckeye Wellness?
>
> [ZACKS]: I believe that there were. In our different conversations at times, there were concepts bantered back and forth, but there was no specific offer that this is what someone is willing to do to have you become a partner.

(Tr. Vol. I at 89.) After the meeting, Hall retained counsel, and began negotiating an exit from Buckeye Wellness. At one point, Hall began applying for other positions. He met again with management in another attempt to strike a new deal. The deal never happened.

{¶ 25} Hall sent a letter of resignation to Zacks on February 16, 2016. After subsequent discussions, Hall, through counsel, negotiated a termination agreement with Buckeye Wellness where he would continue treating Buckeye Wellness patients as an independent contractor until April 18, 2016, to allow Buckeye Wellness to hire a new physician. In exchange, Hall reduced the mileage restriction in the covenant not to compete from 15 miles to 10 miles. Buckeye Wellness did not sign the termination agreement. Hall's last day was April 18, 2016, and he started at his new practice on April 20, 2016.

{¶ 26} Buckeye Wellness required Santiago to see four patients each hour, but Santiago wanted to modify this term so he could spend more time with each patient. Santiago informed Buckeye Wellness that he wanted to modify his contract and work two days a week instead of one day. After some progress with changing his employment contract, Buckeye Wellness rebuffed his concerns and hired another doctor.

[COUNSEL]: Let me ask you you stated that you asked for additional days, correct?

[SANTIAGO]: Correct.

[COUNSEL]: Was there ever a moment in time where you believed that you were going to get those additional days?

[SANTIAGO]: There was a moment in time. I wrote a letter. I set aside my schedule because I'm working in my other offices. At the last moment, I was blocked, and, obviously, at that moment, you understand that there's no room in that corporation to grow.

[COUNSEL]: Let me ask you were you given a specific reason why you couldn't work additional days during the month?

[SANTIAGO]: They didn't have enough funds.

* * *

[COUNSEL]: Was a part of your displeasure that you asked for additional days and were told simply that they couldn't afford it, and then they brought on a new doctor?

[SANTIAGO]: Completely. Absolutely. This is the core of the undermining, and the core of poor culture within the

> institution of Buckeye [Wellness]. It was an undermining of
> every human being that would work for them.

(Feb. 25, 2020 Tr. Vol. II at 51-53.) Buckeye Wellness did not have electronic medical records ("EMR"), and Santiago was displeased with the primitive record keeping that forced him to maintain medical charts on paper. Buckeye Wellness did not have adequate and secure bathroom facilities to conduct drug screening and testing of patients prior to prescribing narcotics and Santiago requested a change. Santiago also expressed concerns with the working conditions, including the lack of basic supplies to operate a medical practice. After Santiago expressed his displeasure working under the existing agreement, Buckeye Wellness ultimately responded and asked him to sign a new contract with new terms. (Tr. Vol. II at 39.) However, it was too late. The parties could not agree to new terms.

{¶ 27} Santiago initially sent a letter of resignation to Weinstein on March 2, 2016, but sent another letter to Attorney Zacks on March 16, 2016 after he discovered that Weinstein was no longer involved in the management of Buckeye Wellness. Santiago was concerned and confused about the ownership structure of Buckeye Wellness, and "was always kept in the dark about it." (Tr. Vol. II at 36.) The letters confirmed Santiago's intent to change the terms and conditions of his original contract. Santiago agreed to work an additional two weeks and his last day at Buckeye Wellness was April 14, 2016.

{¶ 28} "If a contract is not ambiguous, it must be enforced as written." *CosmetiCredit, LLC v. World Fin. Network Natl. Bank*, 10th Dist. No. 14AP-32, 2014-Ohio-5301, ¶ 14. The one-year employment agreements expired at the end of one year and were non-renewable. The evidence shows that the doctors did not intend to continue working under the terms and conditions of the original employment agreements, so a new one-year contract does not arise by implication of law. *Ojalvo* at *11. There is "a strong presumption in favor of a contract terminable at will unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other." *One v. Emergency Med. Transp., Inc.*, 11th Dist. No. 2021-T-0011, 2021-Ohio-2990, ¶ 15, quoting *Henkel v. Edn. Research Council of Am.*, 45 Ohio St.2d 249, 255 (1976). Hall and Santiago did not assent to a new one-year term. "An employee who is not subject to an employment agreement becomes an at-will employee." *Sylvester v. Turning Point Counseling Servs.*,

7th Dist. No. 19 MA 0134, 2021-Ohio-1284, ¶ 24. Physicians can be at-will employees. *Mitchell v. Mid-Ohio Emergency Servs., L.L.C.*, 10th Dist. No. 03AP-981, 2004-Ohio-5264. Hall and Santiago were employees at will when they left Buckeye Wellness and not subject to the employment contracts. Appellant's first assignment of error is overruled.

{¶ 29} Appellant asserts as its second assignment of error that the trial court erred in finding that Santiago and Hall were not bound by the restrictive covenants. The trial court found that Hall voluntarily resigned and Santiago's contract expired on January 1, 2015 and, as a result, the restrictive covenants did not apply to either doctor.

{¶ 30} "Ohio courts review noncompetes for physicians with a critical lens." *Wigton v. Univ. of Cincinnati Physicians, Inc.*, 1st Dist. No. C-210305, 2021-Ohio-3576, ¶ 7. Restrictive covenants are generally disfavored and, " '[t]his measure of disfavor is especially acute concerning restrictive covenants among physicians, which affect the public interest to a much greater degree.' " *Castillo-Sang v. Christ Hosp. Cardiovascular Assocs., LLC*, 1st Dist. No. C-200072, 2020-Ohio-6865, ¶ 19, quoting *Ohio Urology Inc. v. Poll,* 72 Ohio App.3d 446, 452-53 (10th Dist.1991). Restrictive covenants must therefore be "strictly construed in favor of professional mobility and access to medical care and facilities." *Id.* But while not favored, "covenants not to compete in the medical profession are not per se unenforceable, and will be upheld if they are reasonable." *Id.*

{¶ 31} Santiago's services agreement contains a covenant not to compete and solicit, which reads:

> COVENANT NOT TO COMPETE AND SOLICIT. During the term of this Agreement, including the renewals hereof, so long as the Medical Doctor/Physician is employed by the Company, and for a period of one (1) year following termination by the Medical Doctor/Physician, Medical Doctor/Physician shall not practice medical medicine or have any legal or equitable ownership in a medical or integrated health care clinic that is within a five (5) mile radius of any of Company's health care clinics or offices. Medical Doctor/Physician shall further not solicit any patient, employee, independent contractor or Medical Doctor/Physician of Company for a period of one (1) year after the termination of this Agreement.

(Ex. B., Jun. 20, 2018 Compl.) Because Santiago is no longer employed by Buckeye Wellness, the covenant is only triggered upon termination by Santiago, and precludes him

from practicing within a five-mile radius of Buckeye Wellness. Section 8 of Santiago's services agreement is captioned termination but does not address the situation where a doctor resigns and voluntarily separates from employment. No other portion of the services agreement addresses termination or separation, and termination by the medical doctor is not defined. Santiago voluntarily resigned.

{¶ 32} Santiago's employment contract ended January 1, 2015, and he left Buckeye Wellness in April 2016 and moved to the new practice on South High Street. The one-year restriction had expired. The new practice is outside of the five-mile radius stated in the restrictive covenant. Therefore, despite any interpretation of the word termination, the covenant not to compete is not triggered by a move to a new office that is not within a five-mile radius of Buckeye Wellness and, therefore, does not apply to Santiago.

{¶ 33} Hall's employment agreement contains a covenant not to compete and solicit, and reads in pertinent part:

> COVENANT NOT TO COMPETE AND SOLICIT. During the term of this Agreement, including the renewals hereof, so long as the Employee is employed by the Employer, and for a period of one (1) year following termination of the Employee, Employee shall not practice medicine or have any legal or equitable ownership in a Business or integrated health care clinic that is within a fifteen (15) mile radius per the AMA of any of Employer's health care clinics. Employee shall further not solicit any patient or employee of Employer for a period of one (1) year after the termination of this agreement. * * * This Covenant Not to Compete & Solicit shall not apply for Employee conducting business in the state of Texas provided that any activity in Texas does not negatively harm the Company in Ohio.

(Ex. A., Jun. 20, 2018 Compl.) Like Santiago, because Hall is no longer employed by Buckeye Wellness, the covenant is triggered by Hall's termination. However, Hall's contract refers to termination of the employee. Hall's agreement also contains a separate section entitled termination, but no provision in that section applies to the instant situation. Employment separation is a term only in Hall's employment agreement, and it is defined as "the separation or termination of Employee's employment with the Company, regardless of the time, manner or cause of such separation or termination." *Id.* Section 13(D) also refers to actions based on an employee's "termination or separation." The language in the

covenant is termination, and the term employment separation is not included in any reference to the covenant not to compete. The employment agreement clearly provided different meanings for the two terms, and they are not interchangeable. Hall voluntarily resigned, and his actions did not meet the definition of terminated in the employment agreement. Appellant argues that the intended meaning was termination of the relationship and not the termination of the employee, but the plain meaning limits termination to firing of the employee, which did not happen here. Hall was not subject to the covenant not to compete and solicit.

{¶ 34} Hall and Santiago were not bound by their respective covenants not to compete. Appellant's second assignment of error is overruled.

{¶ 35} Appellant asserts as its third assignment of error that the trial court erred in finding that appellees did not misappropriate Buckeye Wellness trade secrets, including client lists and referral sources.

{¶ 36} R.C. 1333.61(D) defines trade secret to mean "information, including the whole or any portion or phase of any * * * business information or plans, financial information, or listing of names, addresses, or telephone numbers." A trade secret must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* "Evidence of a trade secret is demonstrated by showing the extent to which the information is known outside the business and the precautions the plaintiff has taken to guard the secret nature of the information." *Columbus Bookkeeping & Business Servs., Inc. v. Ohio State Bookkeeping, LLC*, 10th Dist. No. 11AP-227, 2011 Ohio App. LEXIS 5655 (Dec. 30, 2011) *11, quoting *Thermodyn Corp. v. 3M Co.*, 593 F. Supp.2d 972, 986 (N.D.Ohio 2008).

{¶ 37} The Supreme Court of Ohio adopted six factors to consider in analyzing a trade secret claim: (1) the extent to which the information is known outside the business; (2) the extent to which it is known inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the

information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524-25 (1997). "Conclusory statements as to trade secret factors without supporting factual evidence are insufficient to meet the burden of establishing trade secret status." *Arnos v. MedCorp, Inc.*, 6th Dist. No. L-09-1248, 2010-Ohio-1883, ¶ 28, citing *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 404 (2000).

{¶ 38} Misappropriation of trade secrets is the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." R.C. 1333.61(B)(1). Improper means "includes theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy, or espionage through electronic or other means." R.C. 1333.61(A)(1).

{¶ 39} To prevail on a claim regarding misappropriation of trade secrets, a party must demonstrate by a preponderance of the evidence: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Tomaydo-Tomahhdo L.L.C. v. Vozary*, 8th Dist. No. 104446, 2017-Ohio-4292, ¶ 9.

{¶ 40} Buckeye Wellness claims that appellees misappropriated a client list and an attorney referral list protectable under the Ohio Trade Secrets Act. Client lists can be trade secrets. *Vanguard Transp. Sys., Inc. v. Edwards Transfer & Storage Co.*, 109 Ohio App.3d 786 (10th Dist.1996). A client list can achieve trade secret status "only if the information is not generally known or readily ascertainable to the public." *The Plain Dealer* at 529. "[A] client list entitled to trade secret status typically includes * * * information not available to the public, such as the name of a contact person, a non-public telephone or cell phone number, an email address, and other pertinent business data known only because of the client relationship." *Columbus Bookkeeping & Business Servs.* at * 12. When a party claims particular information constitutes a trade secret, that party "must identify and demonstrate that the information at issue is included in the categories of protected information under R.C. 1333.61." *Eng. Excellence, Inc. v. Meola*, 10th Dist. No. 01AP-1342, 2002-Ohio-5412, ¶ 23.

{¶ 41} Buckeye Wellness argues that it developed an attorney referral list "through marketing efforts and spent 'lots of time and money' creating the list," which was "kept

private, was secured by password protection, and was not shared with anyone." (Appellant's Brief at 31.)  Buckeye Wellness also developed a patient list which was "protected by password protection and were not available to anyone outside of the company."  (Appellant's Brief at 36.)  Buckeye Wellness alleged that appellees used their patient list and attorney referral source to solicit clients for their new practice.

{¶ 42} The trial court held that the attorney referral list was not a trade secret, but devoted little attention to the patient list which Buckeye Wellness also claims is a trade secret.  However, even if the attorney referral list or patient list is found to be a trade secret, appellants have failed to establish that a misappropriation occurred.  There must be evidence that the information was improperly acquired.

{¶ 43} The record falls short of proving misappropriation within the meaning of R.C. 1333.61.  Appellees adamantly deny that they used any information obtained from Buckeye Wellness in the formation and operation of the new practice, including the patient list and attorney referral list.  Appellants offer broad allegations of how appellees "took the Buckeye Wellness medical practice, changed the name, and became owners of a new practice with the same patient base." (Appellant's Brief at 40).  However, appellants offer no evidence as to the specific steps appellees took to obtain or use any trade secrets.  There are no allegations regarding how and when appellees gained access to trade secrets, nor how they were used.  At trial Buckeye Wellness' witnesses could not identify any misappropriated trade secrets nor a single patient that was solicited by appellees:

> [COUNSEL]: Let me ask are you aware of any specific patients that were specifically solicited by Robert Santiago to go to his subsequent employer?
>
> [ZACKS]: At the time, I wasn't involved in the company, and so post the time, I don't have any information one way or the other.
>
> [COUNSEL]: That would also be true for Gina Walker, Dr. Hall, and then also Dr. Syam, correct?
>
> [ZACKS]: Yes, that's the basis of it. Like I said earlier, I wasn't involved, so I don't have direct information on my own about that, no.

(Feb. 24, 2020 Tr. Vol. I at 119.) Walker is one of the few people to have access to the lists, but the trial court record is silent regarding exactly what she did. The allegations are based entirely on speculation, and the evidence does not reflect that appellees misappropriated any trade secrets. Appellant's arguments that appellees used the attorney referral list and patients list and this unauthorized use accounts for the increase in patient count at Hall's and Santiago's new practice and the decrease in patient count at Buckeye Wellness amount to "speculation based on speculation – first, that [appellees] had the customer database; and second, that [appellees'] success is so implausible that it can only be explained if [appellees] actually used the customer database." *Tomaydo-Tomahhdo L.L.C.* at ¶ 17.

{¶ 44} In contrast, the plaintiff in a trade secrets case performed forensic analysis on computer equipment to establish that a former employee accessed company files and copied them onto USB storage devices. *Poseidon Environmental Servs., Inc. v. Nu Way Indus. Waste Mgmt., LLC*, 7th Dist. No. 16 MA 0083, 2017-Ohio-9407; *Retirement Corp. of Am. v. Henning*, 1st Dist. No. C-180643, 2019-Ohio-4589 (former employee accessed employer's password-protected computer system and downloaded customer contact and account information, provided the information to his new employer, and solicited employer's customers); *Al Minor & Assocs., Inc. v. Martin*, 117 Ohio St.3d 58, 2008-Ohio-292 (former employee memorized his former employer's client list and solicited 15 clients for his new business); *Dill-Elam, Inc. v. Smallwood Bros. Transp. Servs., LLC*, 12th Dist. No. CA2005-01-001, 2005-Ohio-6554 (plaintiff presented no evidence showing former employee solicited clients or that he used trade secrets belonging to his former employer for the benefit of his new company).

{¶ 45} Hall and Santiago, pursuant to their professional obligations, informed their patients that they were moving to a new location. Doctors have an obligation to their patients to ensure continuity of care and prevent a patient from being abandoned. These letters do not rise to the level of solicitation.

{¶ 46} It is notable that there are a limited number of medical providers who accept new workers' compensation patients, and so it is logical that patients will seek continuing care with a familiar provider, even when the provider moves. In addition, when you consider that Spanish speaking patients only have one or two medical providers who speak fluent Spanish, Santiago is in great demand by both patients and attorneys, and Buckeye

Wellness recognized this. Santiago testified "[w]hen I initiated working at Buckeye [Wellness], the first day that I saw patients, I was a busy doctor. This practice of Buckeye [Wellness] was never, never started from zero. I was the one who brought those patients, because they were coming to see their doctor of record." (Tr. Vol. II at 34.) Buckeye Wellness scheduled all of their Spanish-speaking patients with Santiago, and 95 percent of the patients he saw while at Buckeye Wellness spoke Spanish. *Id*. at 37.

{¶ 47} Absent any evidence that appellees misappropriated trade secrets to solicit patients or any impermissible purpose, the evidence fails to support the allegations. Appellant's third assignment of error is overruled.

## V. CONCLUSION

{¶ 48} Having overruled all three of appellant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.

_____